454 So.2d 250 (1984)
Stephen G. MARTIN
v.
GULF SOUTH BEVERAGES, INC., Canada Dry Mid South, Inc., Lastarmco, Inc., Aluminum Company of America, Inc., a/k/a Alcoa, and Zapata, Inc.
No. 84 CA 27.
Court of Appeal of Louisiana, Fifth Circuit.
June 29, 1984.
*251 Christopher T. Grace, Jr., P.C., New Orleans, for plaintiff-appellee.
Joseph R. Ward, Jr., Ward & Clesi, New Orleans, for defendants-appellants.
Charles A. Boggs, Thomas W. Lewis, Boggs, Loehn & Rodrigue, New Orleans, for defendant-appellee.
Before KLIEBERT, BOWES and GAUDIN, JJ.
*252 KLIEBERT, Judge.
Plaintiff, Stephen G. Martin, suffered an injury when the sealing cap on a bottle of Canada Dry Club Soda "popped off" and hit him in the left eye. He brought a products liability suit based on strict liability and negligence against the defendant, Lastarmco, Inc., as the alleged manufacturer of the Canada Dry Club Soda, and against Aluminum Company of America (Alcoa), as the alleged manufacturer of the machine which placed the cap on the bottle of soda.[1] A third party claim was also brought by Lastarmco, Inc. against Alcoa. The third party claim was grounded in the alleged defect of the machine used by Lastarmco in putting the cap on the bottle.
Prior to trial, plaintiff and Lastarmco, Inc. stipulated "that the bottle cap in question was defective, which resulted in the injury to the plaintiff, Stephen Martin, and accordingly, Lastarmco and its insurer, Commercial Insurance Company, was liable to plaintiff for all damages recoverable in the proceeding ...." On the second day of trial, on a motion for a directed verdict, the trial judge dismissed plaintiff's claim against Alcoa. Thereafter, the jury trial continued solely on the issue of the quantum due for plaintiff's injuries and the liability of Alcoa under the third party claim made by Lastarmco. The jury brought in a verdict against Lastarmco for $300,000.00 and denied Lastarmco's third party claim against Alcoa.
This suspensive appeal was brought by Lastarmco, Inc. who makes the following assignments of error:
"(I) The jury committed manifest error in failing to find liability against Alcoa.
(II) The jury committed manifest error in awarding general damages to plaintiff in the amount of $300,000.00.
(III) The trial court erred in allowing plaintiff's counsel to request an award for loss of future wages during closing argument in spite of the lack of evidence concerning any such loss."
Neither the plaintiff nor Alcoa appealed nor did they answer the appeal by Lastarmco. For the reasons hereafter stated, we affirm.

QUANTUM
At the time of the injury, on July 1, 1981, the plaintiff was 24 years of age. He was cleaning a vacant apartment as part of his routine duties when he discovered an unused bottle of Canada Dry Soda Water in a closet. He placed the Canada Dry bottle, along with other empty bottles, on the counter top. While he was placing the Canada Dry bottle on the counter, the aluminum cap exploded, striking plaintiff in the left eye. The cap remained stuck in the plaintiff's eye and did not fall out until he started running to the bathroom to see what damage was done to the eye.
The eye was bleeding profusely when he was taken to the East Jefferson Hospital by a co-worker. After a week of treatment, pressure continued to increase in the eye, so Dr. Sanford Pailet[2] decided to relieve the pressure and bleeding through surgery. On this occasion, plaintiff remained in the hospital one week.
Plaintiff testified to extensive pain and difficulty with his vision following the initial surgery. He had difficulty at work because he couldn't work on anything small. After returning to work he missed some work because he was feeling bad. His employer paid him while he was off work.
From his initial examination in the emergency room at East Jefferson, Dr. Pailet, an expert in the field of opthalmology and opthalmologic surgery, diagnosed plaintiff's *253 eye injury as "a lid laceration, corneal abrasion and traumatic hyphemia [blood inside the eye]...." He expressed the opinion that continued hyphemia raised the continuing possibility of (a) glaucoma, (b) cataracts, and (c) a retinal detachment occurring. By means of an ultrasound test, Dr. Pailet excluded the existence of a retinal detachment but testified there existed a strong possibility of reincurring glaucoma and cataracts as well as the possibility of a detached retina occurring in the future. He last saw the plaintiff in November 1981 at which time plaintiff's vision in the left eye was corrected to 20/40. This was slightly better than one-half the 20/20 vision he had in the eye prior to the surgery.
After several months of treatment by Dr. Pailet, Mr. Martin was examined by Dr. William Perez, also an expert in the field of opthalmology. At the time, plaintiff was complaining of trouble seeing double, pain in the eye and headaches. He was particularly bothered by glare and dust. Dr. Perez testified that during his initial examination in December of 1981 he found the left eye was red, tender and painful. The pupil in the eye was square rather than round and "stuck" to the lens of the eye. Plaintiff had 20/20 vision in his right eye and 20/100 vision in his injured left eye. He also found symptoms of cataract and glaucoma in the left eye. Dr. Perez testified that on a June 7, 1982 visit Mr. Martin's vision in his left eye was 20/80, his cataract remained and it was evident he would eventually be required to surgically remove the cataract.
In January 1983, Dr. Perez discovered that Martin's cataract had "kicked up". His vision was reduced to 20/200 in his left eye and his eye pressure was 30, when 12-20 was considered normal, which indicated he had glaucoma. In March 1983 surgery was performed on the eye. Dr. Perez testified that surgery on an eye which has suffered a compression injury was difficult and because of the necessity of cutting pupil muscles, plaintiff's vision would never be restored to its pre-injury level.
After the surgery Mr. Martin was fitted with a contact lens in an attempt to improve his vision. The eye achieved 20/30 vision with the lens, however, Mr. Martin complained of severe discomfort in using the lens. Dr. Perez attributed this to the fact the standard shaped contact lens would not contour to Mr. Martin's now surgically deformed eye. In Dr. Perez's opinion, plaintiff had "a sick eye". He testified that plaintiff, on each visit, complained of headaches, irritation and burning of the left eye. Sheetrock dust and paint fumes would, in Dr. Perez's opinion, irritate the eye. He attributed the headaches to glare and double vision which put a strain on the eyes.
On direct examination, Dr. Perez expressed the view that the glaucoma would get harder and harder to control as plaintiff grew older. That, in the doctor's opinion, meant more pain, headaches, more treatment, more eyedrops and possibly more surgery with the ever existing possibility of the problems encountered with a detached retina.
Dr. Perez believed the plaintiff would have trouble driving cars and reading for extensive periods (over one hour) because of the irregular pupil, the irritation in the eye due to glare, plaintiff having difficulty in judging distances, and the slippage of contact lens, an absolute necessity to correct the vision in the left eye to 20/30. In his opinion, the plaintiff could anticipate a lifetime of doctor visits at about three month intervals providing there were no special complaints.
On direct examination, the doctor also expressed the opinion it was "going to be very, very hard to find a lens that would sit comfortably on [plaintiff's] eye." because when you remove a cataract, as was done to plaintiff, the contact lens can correct for distances only or nearness only, you cannot have both corrections in the same contact lens. On cross-examination, however, he agreed that under the present state of the art, where hard contact lenses are uncomfortable, an extended wear base (soft lens) can be put in the eye and a hard contact *254 lens on top of it. This, however, would not cure the anticipated difficulties due to the inability to have a contact lens which effected a correction for far and near. Apparently, however, regular glasses could be used to maintain the 20/30 vision.
The plaintiff returned to work approximately two and one-half months after the accident. However Mr. Martin's co-workers and supervisor testified as to Mr. Martin's inability to perform up to his pre-injury level. His co-worker, Russell Stansbury, testified that he was assigned as Mr. Martin's "helper" because of his poor vision. Mr. Martin's supervisor testified that he could no longer perform some of the routine detail work required by his position; i.e., float sheetrock, drive a car.
Plaintiff testified that after the cataract was surgically removed in March 1983 his vision got worse. He had trouble performing his work because he had difficulty with depth perception and as a result had trouble climbing ladders, walking on a roof, nailing nails, working with electricity, changing key tumblers in a lock, or working on anything small. Further, he expressed periodic eye strain and headaches, particularly when he attempted to read or work with anything small requiring a concentrated vision, or around dust or fumes.
At the trial, the parties stipulated plaintiff had incurred medical expenses of $9,045.25. At the time of the injury, plaintiff earned $6.50 per hour plus $50.00 per week for "on call" time and a $50.00 per month car allowance. When the second surgery was performed, plaintiff was earning $7.50 per hour plus $11.00 per hour for overtime, with an average of eight hours overtime per week, and $50.00 per month car allowance. Dr. Wolfson, an expert economist, computed his lost wages at $4,526.00 based on an absence from work during the period July 1, 1981 thru September 3, 1981 and between March 23, 1983 and April 24, 1983. Mrs. Manual, the plaintiff's supervisor, computed the lost wages at $4,890.00.
Notwithstanding the trial judge's rejection of counsel for plaintiff's effort to prove loss of future wages through the testimony of an economist, the trial judge, over defendant's objection, permitted plaintiff's counsel to argue to the jury for loss of wages. Defendant now argues the jury was thus misled into making an overly speculative award for future loss of earnings. This argument is without merit. In his charges, the trial judge told the jury "the only evidence you can consider during the course of this trial is what you hear from the witness stand under oath." Defendant's counsel pointed out in his oral argument that plaintiff was working and earning more at the time of trial than prior to the injury. In accordance with the interrogatories it was asked to answer, the jury set an "in globo" award. We nor anyone else knows with certainty whether the jury included or excluded an award for future loss of earnings in reaching its conclusion as to the total award. It would be pure speculation for us to conclude it did and based on that speculation conclude the jury erred.
The defendant also argues that considering the entire medical condition of the plaintiff and the excellent result obtained by his physicians, the award to the plaintiff of $300,000.00 was excessive. In support of his contention, he points out that the highest award by a Louisiana court for the total loss of an eye was the $150,000.00, awarded in Outlaw v. Bituminous Insurance Company, 357 So.2d 1350 (4th Cir. 1978), to a nine year old child. He suggests that the award of $240,000.00 for the loss of an eye made to a seaman who had special damages of $35,000.00 and loss of future earnings of $155,000.00 in the case Allen v. Sea Coast Products, Inc., 623 F.2d 355 is an approximate guide for this case.
Civil Code Article 1934(3) provides that in the assessment of general damages "much discretion must be left to the [trial] judge or jury". From this, the State Supreme Court has established two standards in the appellate review of lower court awards: (1) To modify the amount of the award an appellate court must find that the *255 trial judge or jury abused the much discretion accorded by the codal provisions in making the award, and (2) The award in other cases serve only as an aid in determining whether there has been an abuse of the discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977); Reck v. Stevens, 373 So.2d 498 (La.1979).
We agree the award is generous and higher than has been previously approved by Louisiana appellate courts for the loss of an eye. Nevertheless, we cannot say the jury has abused its much discretion in fixing the award. The plaintiff is an aggressive, hardworking, young man. The medical evidence shows he has been disabled by the injury more than he would have been by the complete loss of the eye. He has a lifetime of pain and suffering ahead of him which will require continued and repeated medical attention. Because of the partial loss, he will repeatedly sustain eye irritations from glare, dust or fumes and is an excellent candidate for future bouts of glaucoma and a possible detached retina. This, coupled with the need for artificial correction of the vision in the left eye hampers his ability to perform some types of work (sheetrock finishing, painting) which he was trained to perform and to operate machinery. Additionally, the medical evidence preponderates to the effect medical science will not be able to maintain the corrected 20/30 vision he had obtained with hard contact lens at the time of trial. In our view, the plaintiff's disability here is more akin to that normally attributed to the loss of a leg rather than the loss of an eye. In the case of a leg, mobility can be restored by an artificial limb, but the use of the artificial limb will cause pain and suffering. Accordingly, we will not disturb the jury's award.

LIABILITY OF ALCOA
The liability of Lastarmco, as the bottler of the total product, a bottle of soda water, was admitted in the trial court. The only liability which was at issue in the trial court and here is that of Alcoa, the manufacturer of the bottling machine used by Lastarmco in producing the bottle of soda water.
Lastarmco's third party claim against Alcoa is grounded in the contention the bottling machine manufactured by Alcoa was defective in that it randomly misapplied the sealing cap and that Alcoa was aware of the defect. In support of their position, Lastarmco introduced at trial: (1) Evidence indicating the headset of the machine contained numerous design defects, (2) Evidence indicating Alcoa's own employees recognized problems with the machine's ability to produce safe closures and (3) The report of an independent laboratory identifying design defects in the machine. In defense, Alcoa maintains that the machine was not inherently defective and that the defective closure was the result of Lastmarco's improper adjustment of the machine and its failure to follow recommended quality control.
As part of their bottling operations, Lastarmco used an Alcoa Model 212 capping machine. Essentially, the machine takes blank aluminum caps and by the spinning of a "headset", under pressure, around the neck of the grooved bottle, forms the aluminum to the contour of the grooved bottleneck. Due to this shaping process the blank aluminum cap becomes threaded to the bottle forming a closure. In order to form a reliable closure for use with carbonated beverages it is necessary that the threads created by the machine conform the aluminum cap to the full width and depth of the grooves on the bottle. The machine had adjustments by which the pressure applied during the spinning process could be increased or decreased. Excessive pressure would cause the machine to cut the aluminum. Insufficient pressure would cause insufficient depth to the grooves.
Lastarmco contends the design defects in Alcoa's Model 212 machine caused random failures in bottle closures and points to the following in support of its contention. The internal documents of Alcoa show that in its initial test Alcoa found the machine was producing 80% to 90% shallow threads. *256 Further, an independent testing laboratory was contacted to examine the machine after Alcoa's personnel held mini-conferences concerning field complaints of the machine's failure. According to the report of the independent laboratory, Battelle, the machine had two design defects: (1) friction build up and (2) spring movement within the headset. These were the same defects found by Lastarmco's expert, Dr. Meddy Sabbaghian.
In response, Alcoa contends the machine produced adequate closures when the machine was adjusted to apply the recommended pressure during the capping operation; hence, any defect in the cap was a result of poor maintenance and quality control on the part of Lastarmco. Alcoa recommended the pressure exerted on the caps during the spinning process be between 38-40 pounds. Further, it recommended eight bottles be tested every two hours to assure the machine was producing adequate closure and thread depths.
The record reveals that while Lastarmco's employees were aware of the recommended pressure of 38-40 pounds, the person in charge of maintaining the machine, Mr. Lang, testified that he set the pressure at only 35 pounds. Further, he did not inspect the machine regularly, but rather, relied on Mr. Baudoin, in quality control, to point out a problem.
Likewise, the record shows there was miscommunication concerning the testing of the closure which resulted in inadequate testing. Alcoa had recommended testing every two hours in its instruction booklet; however, on the basis of information supplied by Canada Dry employees, at the time of the manufacture of the particular cap involved here, the test was being performed only twice a day.
Lastarmco argues the inadequate testing was immaterial because the expert testimony shows that due to design defects the machine randomly misapplied caps; hence, no testing method short of visual inspection of every bottle would be effective. Consequently, Lastarmco argues Alcoa be held strictly liable for its defective machine.
The jury answered the interrogatories propounded to it as follows:
1. Was defendant, Lastarmco, at fault in this case?
 YES &check; NO ___________
2. Was such fault a proximate cause of the damages?
 YES &check; NO ___________
3. Was defendant, Alcoa, at fault in this case?
 YES ___________ NO &check; 
4. Was such fault a proximate cause of the damages?
 YES ___________ NO &check; 
5. If your answers to questions 1, 2, 3, and 4 are yes, state in percentages how much Lastarmco and how much Alcoa were at fault:
 Lastarmco's fault 100 %
 Alcoa's fault - %
Thus, the jury made the factual determination the cause of the defective cap which injured plaintiff was Lastarmco's failure to properly adjust the pressure on the machine rather than a defect in the Alcoa Model 212 machine. Although there is conflicting evidence on the issue, there is ample evidence in the record to support the jury's conclusion the defect was due to Lastarmco's failure to properly adjust the machine to the pressure recommended by Alcoa rather than a defect in the machine which caused a random defective cap.
The seminal decision for all Louisiana jurisprudence dealing with the question of appellate review of a trial court's factual determination is Canter v. Koehring, 283 So.2d 716 (La.1973). Under the standard of review, established in Canter, supra and its progeny, we should not merely substitute our conclusion for that of the jury. Rather, we must first determine if the jury was manifestly wrong in reaching its conclusion. After hearing the evidence the jury obviously concluded Lastarmco's actions were the proximate cause of plaintiff's injury. While there is evidence indicating Alcoa's machine did at times randomly *257 misapply a cap, the jury concluded the defect in the particular cap which struck plaintiff in the eye was a result of Lastarmco's failure to maintain the recommended quality control and to adjust the machine to the pressure recommended by Alcoa. Since the record contains ample evidence to support this conclusion, we cannot say it is manifestly erroneous.
Accordingly, the judgment of the lower court is affirmed. Lastarmco is to pay all costs.
AFFIRMED.
NOTES
[1] Commercial Insurance Company, the insurer of Lastarmco, entered the litigation and answered on behalf of its insured. Other corporations were originally made defendants and subsequently dismissed by consent of all parties.
[2] Dr. Pailet's decision to operate was supported by Dr. Ellis who had been called in by plaintiff's parents for a second opinion.