KLIEBERT, Judge.
Plaintiff, Ms. Adela Gonzales, was injured when a twist-type aluminum sealing cap on a bottle of Schweppes Bitter Lemon “flew off” and struck her in the eye. Through her father, the administrator of her estate, Ms. Gonzales brought a products liability action alleging strict liability and negligence against Louisiana Coca-Cola Bottling Company, Inc. (La. Coke) and Schweppes U.S.A., Ltd. and the same allegations against Aluminum Company of America (Alcoa) as the alleged manufacturer of the aluminum cap.[1]
La. Coke filed a third party demand against Alcoa seeking indemnity and/or contribution based on alleged negligence and/or fault in manufacturing a defective closure system (the cap and the headset of the capping machine used to make the closure on the bottle). Alcoa then filed a third party demand against La. Coke seeking indemnity and/or contribution based on La. Coke’s failure to follow the quality control standards (recommended by Alcoa) in using the closure system designed by Alcoa.
The injury to Ms. Gonzales’ eye occurred when she tried to “untwist” the cap off the bottle of Bitter Lemon. The cap had been previously removed and replaced on the bottle while it was in the Gonzales household. As Ms. Gonzales started to untwist the cap, it “flew off”, striking her in the eye.
Prior to trial, the parties stipulated to damages in the amount of $225,000.00. A *626 bench trial was held on the liability issues. At the commencement of the trial, plaintiff adopted La. Coke’s case against Alcoa as her own.
Everyone agreed the cap which caused plaintiffs injuries was defective. The disagreement between the two defendants is whether the defective cap was caused by a defect in the capping machine or cap (closure system) designed and sold by Alcoa or in the maintenance and operation of the capping machine by La. Coke. After trial, the trial court concluded there was actual fault on the part of both defendants and accordingly cast La. Coke and Alcoa in judgment jointly and in solido for the stipulated damages.
La. Coke and Alcoa suspensively appealed the judgment. The plaintiff neither appealed nor answered the appeals taken by the defendants. For the reasons hereafter stated we affirm the trial judge.
As part of their bottling operations, La. Coke used an Alcoa Series Model 200 capping machine. Essentially, the machine takes blank aluminum caps (provided by Alcoa) and by spinning a “headset” (designed by Alcoa), under pressure, around the neck of a grooved bottle, forms the aluminum cap to the contour of the grooved bottle neck. By means of this shaping process, the blank aluminum cap becomes threaded to the bottle, forming a seal and closure which can be removed and reused. Additionally, during the spinning of the headset, the lower portion of the cap is formed into a “pilfer-proof ring”. As the user unscrews the cap, the pilfer-proof ring breaks off and stays on the bottle as the cap is removed. Although the ring sometimes helps to hold the cap to the bottle, its primary function is to alert the user when a cap has been previously removed from a bottle.
In order to form a reliable closure for use with carbonated beverages, it is necessary that the threads created by the headset conform the aluminum cap to a width and depth of the grooves on the bottle sufficient to withstand the pressures generated by the carbon dioxide contained in the beverage. Twisting the cap should result in a release of the seal between the top of the bottle and the cap and allow the gas in the carbonated beverage' to bleed off while the cap is still adhering to the bottle.
The “headset” involved here was designed so that the pressure applied to the cap during the spinning process could be reset or readjusted. Excessive pressure results in insufficient depth to the grooves made in the cap. Improper molding of the cap to the bottle results in weak seals and poor adherence of the cap to the bottle. As a result, a twist of the cap may (as occurred to plaintiff here) cause the cap to be prematurely released from the bottle and be propelled like a missile from the bottle ■ by the escaping gas.
As a products liability case two theories of recovery for the plaintiff are urged: (1) strict liability or (2) negligence.
The Louisiana jurisprudence permits recovery on the basis of strict liability under Louisiana Civil Code Article 2317 where the prescribed criteria are present. Those cri- ' teria were set out in Andry v. Canada Dry Corp., Div. of Norton Simon, Inc., 355 So.2d 639 (La.App. 4th Cir.1978), writ refused 357 So.2d 1167 (La.1978) where the court at page 641 said:
“— Lastarmco manufactured the total product, a bottle of soda water. This completed product malfunctioned when used as intended by the manufacturer, and the malfunction caused bodily injury to plaintiff.”
“... the manufacturer of a product who places the product on the consumer market is liable for the foreseeable consequences (including bodily injury) of a malfunction of the product if the product reaches the user in substantially the same condition in which it was sold and if the product is used in the manner intended by the manufacturer. To state it another way, we hold that a plaintiff injured as a foreseeable consequence of a product malfunction is entitled to recover if he proves:
(a) that the defendant manufactured the product;2
*627 (b) that defendant placed the product on the consumer market;
(c) that the product reached the user in substantially the same condition in which it was when defendant placed it on the consumer market;
(d) that at the time the injury was caused, the product was being used in the manner intended by the manufacturer.
Proof of negligence on the part of the manufacturer is not a prerequisite to recovery.”
Here La. Coke manufactured the total product, i.e., a bottle of bitter lemon. The completed product malfunctioned when used as intended by the manufacturer and the malfunction caused bodily injury to the plaintiff. Thus, under the article as interpreted by the jurisprudence, it would appear plaintiff can recover from La. Coke, as the manufacturer of the total product, without the necessity of proving negligence as a prerequisite.
However, La. Coke contends it is not strictly liable to the plaintiff because it is not the manufacturer of the product containing the defect which caused the plaintiffs injury. Rather, it contends Alcoa is the one who is strictly liable to plaintiff because it is the manufacturer of a product, i.e., a closure system (the cap and the headset) which contained the defect which resulted in the injury to the plaintiff. On the other hand, counsel for Alcoa contends there has never been a Louisiana decision against Alcoa or any other closure system manufacturer in a situation similar to that present here for several reasons which are especially valid in this case: (1) Alcoa only manufactures a component part (the cap) of the final product (the bottle of beverage), (2) Alcoa sells that component part in an unthreaded condition which presents no risk or harm to any consumer, (3) the cap is not defective when it leaves Alcoa (the manufacturer of the cap), (4) when the cap is properly applied by the bottler as intended by Alcoa, it presents no risk to a consumer, (5) the cap only presents risk of injury to a consumer when it is misapplied by the bottler, (6) misapplication by the bottler is not the use intended by Alcoa, and (7) misapplication by the bottler substantially changes Alcoa’s design of the cap and its pressure-holding capacity.
The trial judge made no determination as to which of the contentions as to strict liability were applicable for he decided the issue of liability on actual fault.
In his reasons for judgment the trial judge found the closure system (the headset) designed by Alcoa produced defective closures in a random fashion. He also found La. Coke did not adhere to the testing and inspection procedures recommended by Alcoa to avoid or minimize the number of defective closures delivered to the consumer. Based on these factual findings he concluded La. Coke and Alcoa were jointly negligent in producing the defective cap which injured the plaintiff (the Gonzales cap) and in permitting it to be delivered to the consumer in a defective condition.
The cap which caused the injury was produced in October 1978 and was introduced in evidence. A visual inspection shows it to be grossly defective in that it had very limited threads of a very shallow depth. There are two possible explanations as to the cause of the defective cap — (1) La. Coke did not properly maintain or adjust the “headset”, or (2) the Gonzales cap was the result of a random misapplication of the “headset”.
The “headset” contained a compression type spring to transmit force to the rollers which indented the metal cap around the threaded bottle neck, thereby forming the threads on the cap. Later sets were designed for torsion type springs. The testimonial and documentary evidence introduced at the trial, in particular, the testimony of Dr. Mehdy Sabbaghian, the report of the Battelle Institute and the internal Alcoa documents, all introduced in evidence, apparently convinced the trial court, as it does us, that the closure system (cap and headset) in use by La. Coke was capable of and did in fact produce the defective Gonzales cap.
*628 Dr. Sabbaghian was an expert in the field of mechanical engineering with a specialized expertise in the field of friction and bearing design and a professor of mechanical engineering at Louisiana State University at the time of his appearance. In his opinion, there were factors inherent in the design and operation of the headset which contributed to the random production of defective closures, namely:
a. The displacement or sliding of the end of the spring, caused variability in the pressure set into the springs; (as was explained at trial, the mechanic sets a particular pressure into the headset prior to installing the headset onto the capping machine. The headset is supposed to maintain this pressure);
b. The friction effect in the cam follower arm, as it oscillates on the pivot shaft, caused variation in the side pressure springs;
c. The Alcoa method of lubrication provided no guarantee that a steady and unvariable amount of lubrication will be present at any particular time. This, again, caused a variation in the amount of side pressure force transmitted to the rollers and thereby transmitted to the cap itself;
d. the stiffness of the spring and its sensitivity, causes variability in the side pressure applied to the closure because this sensitive spring is subject to minute forces which will change the side pressure originally put into the headset by the mechanic.
Due to these engineering deficiencies a headset may be properly set by a mechanic; but, nevertheless, unpredictably, the pressure transmitted from the spring to the rollers to the cap would vary as much as 40% and thereby affect the depth and width of the thread on the cap and therefore the quality of the closure. In Dr. Sabbaghian’s view, therefore, notwithstanding adherence to the recommended maintenance and pressure adjustments on the headset, the engineering deficiencies of the headset would nevertheless cause it to produce defective closures.
An independent serviceman, Mr. Tommy Diggs, who had been trained by Alcoa, testified that on occasions he had run bottles through the Alcoa headset and produced perfectly threaded closures, then, for no apparent reason, the machine would produce a bottle with a poor closure. Upon re-running the same bottle through the capping machine it would then produce a good closure. Mr. Diggs also testified that the side pressure spring on the type of headset involved was “sensitive”, meaning easily subject to pressure variations.
Further supporting the conclusion reached by Dr. Sabbaghian is the test run by Alcoa’s witness, Dr. Julian Doughty. He set up a model system at the Alcoa plant in Richmond, Indiana. Of the approximately 200 bottles he ran through the model system, two or three resulted in closures which were sufficiently defective for Dr. Doughty to conclude he would not consider sending them into the market place.
Alcoa’s internal records (the memorandum entitled “May 27, 1971 Mini Conference”, subtitled “What’s The Matter With Our Headsets”) further supports the trial judge’s findings and conclusion. It shows Alcoa was informed by its technical representative and knew the “headset” of the type in question, although properly adjusted, produced variations in the quality of the thread roll from bottle to bottle and from day to day. Its employee and witness here, Mr. Denhart hypothesized that the reason for the poor quality of the closures was the manner in which the side pressure spring was held and compressed, i.e., the spring was pushed sideways as it compressed because the spring stud was not free to pivot.
The Battelle Memorial Institute was retained by Alcoa to “identify, select, and define improvements” in Alcoa’s closure system which would enhance the capability of the bottler in maintaining quality assurance of adequate closure. In its report Battelle made the following observations:
*629 1. Functional incompatibilities exist between the requirements of the closure system and the performance characteristic capabilities of the current headset;
2. Principle causes of these problems were identified as torque hysteresis and fluctuations in torque rates;
3. Forming torques developed by the headset oscillate randomly and by as much as 17.5 in.-lbs. of torque hysteresis;
4. Forming pressures are estimated to vary by 40 percent or more within the range of roller pivot required for closure application;
5. Torque hysteresis results primarily from excessive friction and secondarily from radial side spring displacement;
6. Torque rate is adversely affected by side spring displacement, wedging of the pivot shaft yoke with respect to the fixed side spring stud and friction and binding at the interface between the yoke and the side spring washer;
7. The reliability of the system is dependent upon an intricate balance of extreme torque and position occurrence probabilities;
8. The state of lubrication of the headset caused variances on the closure applied;
Alcoa and La. Coke stipulated that the spring contained in the particular headset which produced the defective Gonzales closure was a 400 lb. spring. Although Alcoa in 1970 elected to change to a 230 lb. spring in subsequently constructed headsets and found that there were lesser incidences of premature releases with the 230 lb. spring than with the 400 lb. spring, it did not at any time warn bottlers with the 400 lb. springs in operational headsets of the defective closure problem or of the improvements which could be obtained by changing to a 230 lb. spring.
Dr. Julian Doughty, an aeronautical engineer, made a visual and physical examination of the Gonzales bottle and cap and attempted to produce a cap defectively similar to the Gonzales cap. He concluded and so testified that only a grossly misadjusted headset could produce a cap with as much poor thread depth as the Gonzales cap. Further, he testified that the design of the headset is such that where the headset is properly set it is not capable under any circumstance of a random misapplication of the magnitude demonstrated by the Gonzales cap.
Here counsel for Alcoa argues that Dr. Doughty’s opinion should have been accepted over that of Dr. Sabbaghian. For us to do that, however, we would first have to conclude the trial judge created manifest error in his fact findings and/or his conclusion. We cannot do that here because our review of the record not only shows there was ample evidence to support the trial judge’s findings of fact and his conclusions; it also convinces us that a cause in fact of the Gonzales defective closure was the misapplication of the Alcoa designed cap and headset.
Although it would be logical to believe the defective Gonzales cap was randomly produced by the Alcoa closure system or by a poorly maintained or adjusted headset, we believe, as did Dr. Sabbaghian and the trial judge, that it is more probable than not it was produced by a random misapplication of the closure system, because, if produced by a poorly maintained or adjusted headset the machine would have continued to produce defective caps until the defective caps were detected. Further, there is no evidence indicating La. Coke did not properly maintain or adjust the headset or that a quantity of defective closures were produced at the time the Gonzales closure was produced.
By supplemental brief, Alcoa argues that in view of our decision in Martin v. Gulf South Beverages, Inc., 454 So.2d 250 (La.App. 5th Cir.1984), we are bound to discharge them from liability because the cases are identical. Although the Martin case is similar to this case they are distinguishable on the facts. As we stated in Martin, there was conflicting evidence as to whether the defect in the Martin cap was caused by the bottler’s misuse of the capping machine or by an inherent defect *630 in the machine; nevertheless, we concluded in Martin, at page 256:
While there is evidence indicating Alcoa’s machine did at times randomly misapply a cap, the jury concluded the defect in the particular cap which struck plaintiff in the eye was a result of Lastarmco’s (bottler’s) failure to maintain the recommended quality control. ...” (Emphasis supplied)
Here, however, we and the original trier of the facts concluded one of the causes in fact of plaintiff’s injury was the inherent defect in the Alcoa closure system, i.e., the random misapplication of the cap. Simply stated in the Martin case there was insufficient evidence for us to conclude the jury had erred in failing to conclude the cap which caused the injury was the result of a random misapplication of the headset, whereas here, not only did the trier of the facts conclude the defective cap was produced by a random misapplication of the machine; the evidence is sufficient to convince us the trial judge’s conclusion was correct. Further, in Martin there was direct evidence showing the pressure setting on the machine being operated at the time the defective Martin cap was produced was set at an inadequate pressure, whereas here, there is no such evidence.
Although it is not every cause in fact of an injury which gives rise to the imposition of liability, there can be more than one cause in fact of an injury for which liability is imposed provided there is a corresponding violation of a duty owed by the creator of the cause in fact to protect the injured party from the injury sustained. Mathews v. Elder Intern., 400 So.2d 251 (4th Cir.1981). Hence, although the inherent defect in the closure system was found to be a cause in fact of the defective cap this does not, as urged by La. Coke, absolve it from liability.
The trier of the facts found another cause in fact in the defective cap, namely, that La. Coke failed to adopt inspection and testing procedures which would minimize or prevent the flow of defective closures such as the Gonzales cap into the market . place.
Mr. Percy Gros, an employee of La. Coke testified that at the time the defective cap was produced he was the production manager. His duties as production manager included the production facility, bottling, premixed, quality control and maintenance. Mr. Gros testified that during this period he worked approximately 12 hours a. day, 5 days a week. This pace caused him to be lax in performing the recommended number of Proper Application Tests (PAT) recommended by Alcoa. Likewise, a common practice was to take a torque removal test and not record a PAT test and vice versa. In a twenty-four hour period, proper procedure would require 12 to 13 PAT tests, but only three were performed in the time span when the Gonzales cap was most probably produced. The carbonation test required by the maker of the product was not always performed to determine the amount or dissipation of the carbonation. The record is also vague and unclear as to when (before or after the Gonzales cap was produced) La. Coke employed Ms. Becnel to be a quality control manager. Additionally, there is considerable testimony in the record as to the statistical probability of La. Coke having discovered the defective cap had it adhered to the quality control procedures and standards recommended by Alcoa.
Thus, there is ample evidence in the record to support the trial judge’s conclusion as to the obligation of La. Coke to the consuming public. As a reviewing court, it is not our function to substitute our view for that of the trier of the facts. The seminal decision setting forth the standard of review is Canter v. Koehring, 283 So.2d 716 (La.1973). Under it and its progeny, where there is conflict in the evidence, we are not at liberty to disturb reasonable evaluation of credibility and reasonable inference of fact, even though we may find our own evaluations and inferences are as reasonable.
Since both La. Coke and Alcoa were a cause in fact of the injury and each *631 had a corresponding duty to the public in general and to Ms. Gonzales in particular not to allow defective closures into the market place, they have a mutual obligation to the plaintiff to pay for the damages she sustained as a result of their failure to adhere to that duty. Jones v. Robbins, 289 So.2d 104 (La.1974); Pepitone v. State Farm Mut. Auto Ins. Co., 369 So.2d 267 (4th Cir.1979) writs denied 371 So.2d 1343 (La.1979). Hence the trial court correctly cast them solidarily liable to the plaintiff as joint tortfeasors. LSA-C.C. Art. 2324. McCreary v. Commercial U. Ins. Co., 372 So.2d 745 (4th Cir.1979); Guilbeau v. Guilbeau, 326 So.2d 654 (3rd Cir.1976).
Both defendants contend on appeal that the trial court erred in ruling on their respective third-party demand against their co-defendants for contribution and/or indemnity. The trial court’s judgment in addition to finding the defendants solidarily liable to the plaintiff, cast each of the two defendants liable for 50% of the damages. The trial court properly held that the two defendants as solidary obligors were entitled to contribution from their respective joint tortfeasors for his virile share. LSA-C.C. Article 2103.[1] Bacile v. Parish of Jefferson, 411 So.2d 1088 (4th Cir.1981).
Once the trial court found that the co-defendants were joint tortfeasors and granted them contribution, he properly denied them indemnification. Indemnification would shift the entire loss from a tortfeasor only technically or constructively at fault to the party primarily responsible for the action that caused the damage. Green v. TACA International Airlines, 304 So.2d 357 (La.1974); Appalachian Corp. v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539 (La.1922). Thus, if either of the defendants were found to be only constructively or technically at fault, then that defendant would be entitled to 100% indemnification from the other defendant who has been found to be actually at fault. In this instance, however, both defendants have been found to be concurrently at fault, hence, neither is entitled to indemnification from the other. Bacile v. Parish of Jefferson, supra.
Accordingly, the judgment of the trial court is affirmed. Each appellant is to bear his cost of the appeal.
AFFIRMED.

. Plaintiff subsequently amended his petition to allege as against Alcoa a defective closure system as was alleged by La. Coke in its third party demand against Alcoa. Schweppes merely filed a general denial and by apparent acquiescence of all parties has been dismissed or at least ignored in the action.

. The amendment to LSA-C.C. Art. 2103 did not go into effect until August 1, 1980, hence, the applicable law is LSA-C.C. Art. 2103 prior to its amendment by Act No. 431 of 1979.