SHORTESS, Judge.
A. Ray Michelli (plaintiff) brought suit for damages incurred by his minor daughter, Melissa Jean Michelli (Missy) when she was hit in the eye by a coin propelled from a slingshot. Named as defendants were Steve and Cheryl Lancon, parents of the child, Denny, who actually fired the shot which injured Missy’s eye, and their insurers; and Melvin Eunice, father of the child, William (Moosey), whose slingshot was involved in the accident and at whose home the children were playing; as well as the Eunices’ homeowner insurer. Eunice filed *841 a cross claim against the Lancons and their insurer. In turn, the Lancons and their insurer, Vanguard Insurance Company (defendants) filed a third party demand against Eunice and American General.
At trial, the court found defendants solely liable for the accident, and granted a directed verdict in favor of Eunice and his insurer. Defendants’ third party demand was denied. Defendants have appealed that judgment, assigning as error the dismissal of its third party demand, the trial court’s failure to find Missy contributorily negligent, and the damage award of $100,-000.00.
Missy Michelli was 12 years old at the time of the accident; her friend, Moosey Eunice was almost 12 years old, and Denny Lancon was almost 11 years old. On November 25, 1985, Missy and Denny were visiting the Eunice household for an impromptu birthday party for Joe Eunice, Moosey’s younger brother. Several children were there before Missy arrived around noon. When the other children left, Moosey, Missy, and Denny stayed at the house, playing games in Moosey’s room. Mrs. Eunice was in the house the entire time the children were there, doing general housework. She testified that she checked on the children every 10 to 15 minutes.
The children had been in Moosey’s room for a few minutes when the accident happened. The testimony is in dispute as to who first picked up the slingshot, but it is clear that the slingshot was laying on a table next to one of two beds in the bedroom, along with other toys. The slingshot, according to Mrs. Eunice, was one of two she had bought some six months earlier for Joe and Moosey. In both his deposition and at trial, Denny testified that Missy first picked up the slingshot and began shooting “gummy bears,” a type of jellylike candy, at his leg. In his deposition, Moosey testified that Denny first shot the slingshot using gummy bears; at trial, in response to questioning from the court, Moosey testified that he remembered Missy shooting gummy bears and Denny taking the slingshot from her and shooting coins. Missy testified in her deposition that she was unsure who first used the slingshot, but that she had it and shot Denny with gummy bears in the leg; at trial she was unequivocal in her testimony that she picked up the slingshot first and shot bears at Denny’s legs. She was absolutely sure she did not use coins; Denny, on the other hand, believed she shot coins at him.
After getting the sling shot from Missy, Denny shot at her legs, which were drawn up to her face, with either a nickel or a quarter, and the coin hit Missy in the left eye. She began to cry, and Moosey told Denny to apologize to her. After a few minutes, Missy walked home. Mrs. Eunice was unaware that she had been shot and had gone home. When she arrived home, Missy’s parents were not home and her older sister drove Missy to an aunt’s home. Missy went to bed with an ice pack on her left eye.
Her parents consulted an ophthalmologist the day after the accident, who permitted Missy to go home. On Thursday Missy became nauseated; on Saturday her eye was very painful, and her vision was deteriorating, so her parents called Dr. Charles Afeman, who was on emergency call.
Dr. Afeman testified that Missy had developed an “eight-ball” type hemorrhage, or intraocular bleeding, which was not uncommon with a contusion to the eye; that the eye was filled with blood, which interfered with normal circulation and created a rise in intraocular pressure; that the “fifth nerve” was extremely irritated by the intense pressure in the eye; that she experienced severe neuralgic pain in and around her eye; that he recommended conservative treatment, hospitalized her and placed her under complete bed rest, meaning she was blindfolded and not allowed to move from bed; that this treatment was designed to bring down the pressure and decrease the internal bleeding in the eye; that it was not successful, and on the fifth day of her hospitalization he performed surgery which involved draining the blood and irrigating the eye; that surgery was successful in relieving the excessive pressure and bleeding; and that he released Missy from the hospital shortly thereafter.
*842 Once home, her activities were severely restricted. She did not return to school until the beginning of January and was unable to socialize or play at all during the Christmas holidays. Gradually her vision returned; however, because a traumatic cataract developed, her vision is still 20/50, down from 20/25 before the accident. Surgery will eventually be required for the cataract, which should restore her sight to 20/30. However, nighttime vision and daytime glare are still affected; during the day in a glare situation, Missy’s vision is currently 20/100; at night it drops to 20/200. She also will have difficulties with peripheral vision. Missy was an avid softball player before the accident; the summer after the accident she did not play because of her fear that she would re-injure her eye. The most significant effects of Missy’s accident, however, are the noticeable iris discoloration and dilated pupil of her left eye, caused by residual scarring and by the “corneal staining” which occurred immediately after the accident. Dr. Afeman testified that this condition cannot be surgically corrected or cosmetically improved, and is permanent.
Defendants’ first assignment of error is that the trial court erred in dismissing their third party demand against Eunice and his insurer. Defendants assert that Moosey, and his parents vicariously, are liable because Moosey had been instructed by his father not to shoot the slingshot indoors, and had practiced with the slingshot at a target set up outdoors. Therefore, defendants argue, the third party demand should not have been dismissed by directed verdict.
We note that Moosey testified he had the slingshot for a couple of months; his mother testified that she had bought the slingshots five or six months earlier. Moosey’s father did not testify. Moosey did testify, both by deposition and at trial, that he was told not to shoot the slingshot in the house because of the danger of hitting someone, and to shoot only at a target set up in the backyard. However, there is nothing in the record to conclude that Moo-sey was negligent. It is clear that Moosey did not shoot the slingshot on the day of the accident, and he did not give permission to either Denny or Missy to use the slingshot. Denny even testified that Moosey asked them to stop before he shot Missy. Defendants argue that Moosey should have prevented Denny from shooting the slingshot; however, they cite no authority in support of the assertion that Moosey owed a duty to prevent Denny from shooting Missy. The trial court was not clearly wrong in finding that defendants failed in their burden of proving contributory negligence on the part of Eunice.
Next, defendants assign as error the trial court’s finding that any negligence on the part of Missy “was not contributory negligence which would reduce recovery.” The trial court reasoned that the “risk of shooting a Gummy Bear is that another will be injured. It is not reasonably foreseeable, however, that another child would escalate the incident by using a metal object.” Defendants argue that this finding is inconsistent: if it was negligent for Denny to shoot the slingshot, then it was negligent for Missy, almost two years older, to shoot the slingshot as well. Further, they argue, it was Missy’s action in shooting the slingshot first which made her injury possible.
The general rule for contributory negligence for a 12-year-old child is that such a child’s caution is judged by his own maturity and capacity to evaluate circumstances in each particular case. Plauche v. Consolidated Companies, 235 La. 692, 105 So.2d 269 (1958). Missy testified she picked up the slingshot first, shot gummy bears at Denny’s leg, and then gave him the slingshot when he asked for it. She “wasn’t real sure” when she gave Denny the slingshot that he was going to shoot at her, but she freely admitted that she immediately put her body in a defensive position so her knees protected her face. We believe that it was reasonably foreseeable, considering that she started shooting first and hit Denny several times with gummy bears, that he would shoot back at her. A 12-year-old child of average intelligence should be generally aware of the consequences of starting a “fight,” whether *843 playful or not. The ammunition the children were using is relevant only in a quantitative sense. The extent of injury caused by flying coins may be greater than that potentially caused by flying candy, but either coins or candy could potentially inflict a serious injury. We believe that the trial court was manifestly erroneous in finding that Missy was not contributorily negligent.
In order to assess a percentage of fault, we must consider the nature of each party’s conduct and the extent of the relation between that conduct and the damages suffered. Kyle v. City of Bogalusa, 506 So.2d 719 (La.App. 1st Cir.1987); Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985). We also take into account the age difference between Missy and Denny, significant at 12 and 10. (Missy was I2V2 at the time of the accident; Denny was not quite 11). Although there is some discrepancy as to whether Missy actually shot the slingshot first, the clear preponderance of evidence shows that she did. Her conduct in shooting gummy bears at Denny, was a direct cause of her damages, as it was certainly foreseeable that Denny would retaliate by shooting whatever came to hand back at her. However, we find there is a more direct relation between Denny’s conduct in shooting a coin and the serious injury to Missy’s eye which resulted. Missy’s fault is assessed by us at 15%.
Defendants assign as their third specification of error the trial court’s award of $100,000.00 in damages to Missy. We have discussed Missy’s injury earlier. Defendants argue that Missy’s eyesight will be restored to 90% of pre-injury condition after the cataract surgery is performed; that she has not been restricted in her activities since her surgery; and that she has made an excellent recovery.
All this is true; however, defendants overlook the permanent disfigurement which the trial court found as a fact. Missy was a young girl at the time of the accident, and for the rest of her life her left eye will be noticeably different in color from the right, as well as being permanently dilated. Further, the pain she experienced in the two weeks following the accident, which caused her to “almost twist into a little ball” during examinations of her eye, according to Dr. Afeman, was excruciating. There was a very real risk of permanent loss of vision in the left eye until the initial surgery was performed, according to Dr. Afeman. It was not until August of the year following the accident that Missy’s visual acuity returned; it was March before she could see large letters.
Although defendants make much of the fact that Missy was released to play softball the summer after the accident, and she decided not to do so, it is apparent from Dr. Afeman’s testimony that she may have been severely handicapped in her ability to react quickly enough to protect her injured eye if a ball came in her direction. Missy testified she was scared her eye would get worse if she played ball. She testified, concerning her feelings about her injured and disfigured eye, that she gets embarrassed and frustrated because people keep asking her about her eye. The' trial judge found that it would be “virtually impossible” not to ask her what happened.
We have reviewed awards to plaintiffs for eye injuries, and find that they range from $12,000.00 for permanent pupil damage, corneal injury, internal bleeding and severe pain to a 41-year-old man, Whitacre v. Halo Optical Products, Inc., 501 So.2d 994 (La.App. 2d Cir.1987), to $300,-000.00 for partial loss of sight accompanied by possible future cataracts, glaucoma, continued pain and discomfort, and an inability to maintain corrected vision, to a 24-year-old male, Martin v. Gulf South Beverages, Inc., 454 So.2d 250 (La.App. 5th Cir.1984). An excellent review of eye awards is given in Varnado v. Sanders, 477 So.2d 1205 (La.App. 1st Cir.), writ denied, 481 So.2d 630 (1985), indicating a range of $25,000.00 to $300,000.00. The trial court’s award of $100,000.00 was clearly not an abuse of its discretion.
Accordingly, the judgment of the trial court is reversed to assess plaintiff with 15% of the fault, and the general damage *844 award is reduced to $85,000.00. Costs of the appeal are taxed to defendants.
REVERSED IN PART, AFFIRMED IN PART, AND AMENDED.