|!WICKER, Judge.
This appeal arises from a petition for damages filed on behalf of Mary Ann Pres-tenback and Norman J. Prestenback, plaintiffs/appellants, against Schwegmann Giant Supermarkets, Inc. (Schwegmann), defendant/appellee. Mary Ann Prestenback (Mrs. Prestenback) alleges she was injured while shopping in defendant’s store when she was struck from behind by a metal rack containing meat which was being moved by an employee of the store. The jury found Schwegmann negligent but did not find that negligence to be a proximate cause of any damages sustained by the plaintiffs. The trial judge rendered a judgment in conformity with the jury verdict, dismissing plaintiffs’ claims. The trial judge also denied subsequently filed motions for judgment notwithstanding the verdict and a new trial. The plaintiffs have appealed. We reverse.
Appellants specify as error the jury was manifestly erroneous in finding that the accident at Schwegmann’s store was not the proximate cause of any damages. We agree for the following reasons which are discussed more fully below: (1) the jury was manifestly erroneous to rely on speculative evidence, and (2) the jury committed legal error in failing to apply the presumption of causation in Orgeron v. Prescott, 93-926 (La.App. 5th Cir. 4/14/94) 636 So.2d 1033, 1041, writ denied, 94-1895 (La.10/28/94) 644 So.2d 654.
The testimony at trial set forth the following. Mrs. Prestenback testified that on November 26, 1991 she was shopping in Schwegmann’s store while accompanied by her ^daughter, • Lisa Prestenback and her daughter’s friend, Benigna Laino (Laino). She stated she was standing at the meat section and had turned to face her daughter and Laino, who were across the aisle approximately five-to-six-feet away from her, when she was struck in the back approximately five inches down from her shoulder between the shoulder blade and vertebrae. She testified she was knocked forward into the case by a meat rack loaded with meat. The impact caused her to have trouble catching her breath. Laino witnessed the accident.
Laino testified she saw Edward Escude (Escude), a Schwegmann’s meat cutter at the time of the accident, filling the meat case from a heavily loaded meat rack. She stated the meat rack was taller than Escude. She saw Escude push the cart without looking, and strike Mrs. Prestenback.
Escude denied pushing the cart into Mrs. Prestenback. He stated he was unloading the meat from a stationary cart at the time he noticed Mrs. Prestenback rubbing her back. Despite his testimony that he did not push the rack and strike her, he nevertheless went over to her and asked if she was all right. He testified he could not understand what Mrs. Prestenback was saying although he denied she was having trouble breathing. Escude did not fill out an accident report at the time. He stated Mrs. Prestenback did not discuss this with him.
Leon Schneider, Schwegmann’s store manager on the date of the incident, testified it was company policy for an employee to report an accident.
The jury found that Schwegmann was negligent but did not find that negligence was a proximate cause of the damages alleged.
Mrs. Prestenback testified she had prior back surgery in 1985 for a ruptured disc. She also stated she has Graves disease, a thyroid condition. She has had radiation to dissolve the thyroid gland. On the night of the accident the spot where she was struck bothered her. The pain worsened the following day. That day was Thanksgiving. She could not see her physician, Dr. Roger Smith, because it was a holiday. The earliest appointment she could get was for December 5, 1991. Dr. Smith, a neurosurgeon, had been treating her for her back. She denied hurting her neck prior to this accident. Dr. Smith recommended a cervical collar, physical therapy, traction, ice, and heat. She was having trouble sleeping and had to use a pillow between her neck and head in order to sleep at night.
IgAfter the incident she had good days and bad days. She had trouble using her hand to hold the telephone or to drive a car. She *152 had pains in the base of her neck and in the muscle from the neck to the shoulder. She began having “considerable pain and numbness” in her arm and hand in 1995. She often used a heating pad at home. Some days she could not do her housework. If she mopped she found she would have more pain the following day.
She described her worst days during the period from the accident to the time of trial in February 1996, as days where she had to stay in bed.
She had a cervical myelogram in 1995. Although Dr. Smith had recommended one on two occasions, she did not have one done as early as he had recommended because her endocrinologist recommended against it due to her elevated blood pressure.
She testified she had the myelogram in 1995 because her left hand was always numb and she could not use it. However, she had a bad experience with a myelogram in 1985, prior to low back surgery, and was fearful of having another one done. After the 1995 myelogram Dr. Kenneth E. Vogel recommended surgery. Mrs. Prestenback stated she had a cervical fusion approximately four months before trial. At the time of trial the pain in her neck was gone and her hand was no longer numb. She still has problems with a muscle between her neck and shoulder but she has had substantial relief.
Dr. Smith’s deposition was read into evidence. Prior to this accident he treated Mrs. Prestenback several years for chronic back pain. In 1985 she had a lumbar discectomy after a myelogram showed a ruptured disc at L-5, S-l. Four years later, on September 28, 1989, she had a relapse with pain in the lower back. She told Mm on that date that she had never been pain-free following the back surgery.
He saw her on December 5, 1991 following the accident in the instant case. She complained to him of pain in her neck as well as headaches. She told him that if she clenched her left fist her whole hand went numb. He examined her and found no obvious bruising or inflammation. She was not particularly tender over the spine. There was no weakness in her arms. He diagnosed her as having a contusion and sprain in the thoracic area. He saw no objective signs of injury or trauma such as muscle spasm or neurological impairment that date. However, x-rays taken that day showed mild scoliosis and straightening in the cervical spine. ^Dr. Smith testified tMs finding was consistent with spine and muscle tightening. He further stated that Mrs. Prestenbaek’s x-rays were consistent with cervical and thoracic sprain. He related the mild scoliosis toward the left to the accident. He did so to a reasonable degree of medical certainty. He explained that the x-rays supported the symptoms she described. He recommended a heating pad and a soft cervical collar. He also prescribed a muscle relaxant and pain medication.
Dr. Smith asked her to return in two weeks, but she did not return for two months. In the interim she had developed pneumoma. Dr. Smith stated that although she may have continued with neck problems during this two-month period, she had a more acute problem of the pneumoma. On tMs second visit of February 6, 1992 he was more concerned about addressing the respiratory problem and referred her to an inter-mst.
Mrs. Prestenback returned to see Dr. Smith on April 9, 1992 with continued complaints of interscapular pain, or pain between the base of the neck and the shoulder blades. He attributed her complaints of low back pain to her prior lumbar disc problem.
Dr. Smith did not find it unusual that Mrs. Prestenback would continue to have neck pain in April 1992. She still continued to complain of neck pain when he saw her June 11,1992. On that date he examined her and noted some tenderness over the cervical spinal processes. He also noticed muscle spasm. She showed good strength and normal sensation that date. He continued to diagnose her as having a cervical sprain. In June 1992 she was still wearing a collar and taking pain medication. He ordered an MRI of the cervical spine to see if anything was impeding her recovery.
On June 25, 1992 he interpreted the MRI. It showed some disc hermation and spurring. It also showed narrowing of the disc spaces *153 at C3^1, C4-5, and C5-6. In his opinion there was no definite impingement on the nerve roots. However, he explained that the MRI is inadequate for excluding nerve root compression because it is mainly a screening test. Additionally, she occasionally complained of pain in her arms, which suggested nerve root irritation, compression, or impingement. His examination, however, did not show signs nerves were injured because there was no weakness, sensory change or reflex change. He recommended she continue with the cervical collar, restart physical therapy, and take 15medication.
Dr. Smith felt that her cervical problems were probably caused by a combination of degenerative disc disease and the accident. He testified that to a reasonable degree of medical certainty the incident of November 26,1991 was at a minimum an aggravation of a preexisting condition based on her history.
When he saw her October 1992 she was tender over the left trapezius muscle and complained of numbness in her right hand. He still did not feel she had compression of the nerves. On November 12, 1992 her symptoms had improved with further physical therapy. When he saw her on December 3, 1992 she still had neck pain. She continued to show improvement on January 21, 1993 when he saw her again. Nevertheless her complaints of neck pain still persisted on February 18,1993 and May 5,1993. He saw her in June 1993 with continued complaints. As of July 15,1993 her pain had been essentially continuous since the injury. He felt these symptoms resulted from the accident to a reasonable degree of medical certainty because they were continuous. A second MRI was done in July 1993. It showed that C5-6 was the most involved disc. He recommended that if she had no improvement that a myelogram be done.
Dr. Smith testified that this is the type of injury which can be persistent. It can improve for a period of time and then worsen.
He further noted continued complaints of neck pain on the following visits: August 23, 1993; October 21, 1993; December 2, 1993; January 10, 1994, and March 30, 1994. On December 2, 1994 she had increased pain with a feeling of numbness and coldness in the arm.
When he saw her for her last visit of June 27, 1994 she did not mention neck pain. However, at the time she was having an acute problem with her back and this problem dominated the conversation he had with her that day.
Dr. Smith was concerned about her chronic problem and suggested a myelogram. He felt that her prognosis was fair and that if her symptoms progressed she could require surgery. Although her symptoms fluctuated, they were not resolved at the time of her last visit.
On August 14, 1995 Mrs. Prestenback saw Dr. John Olson. Dr. Olson, an expert in neurology, testified she complained of neck pain with radiation into her arms. At the time he ftsaw her she was taking 80-to-100 aspirins a week.
He examined her and she appeared to have left C5 nerve root involvement with some suggestion of C6 nerve root involvement. She had some arm weakness. His examination suggested nerve root injury. He thought surgery was appropriate. He performed an EMG test, which showed damage at C5 and C6. He recommended she see Dr. Kenneth E. Vogel, a neurosurgeon. Dr. Olson testified Mrs. Prestenback “unquestionably” had a herniated disc in the neck and that the herniation was associated with nerve root involvement and arm pain. He stated that from her history he though the most likely possibility was that she had a damaged disc as a result of the incident in question.
Dr. Kenneth E. Vogel, an expert in neurology, testified he first saw Mrs. Prestenback on August 29, 1995. He evaluated her for cervical, left shoulder, and left arm pain. He testified that on the first examination he needed further testing to determine causation. He eventually operated on Mrs. Pres-tenback on October 30,1995.
Dr. Vogel testified that his examination revealed severe muscle spasm in Mrs. Pres-tenback’s left shoulder. The sensory examination was normal with no numbness. Reflexes were normal. The joints on the left *154 side of her neck were tender. Dr. Vogel stated Mrs. Prestenback had intractable neck pain. He explained that normally 90% of people are well within three months after an incident with neck pain, but she was still not well after four years.
Dr. Vogel next saw Mrs. Prestenback on September 12, 1995. At that time she had neck, left arm pain, and mild lumbosacral pain. Her examination was basically unchanged. He noted on this date that her left grip had diminished. She had an MRI on September 5, 1995 which revealed degeneration and a minimal bulge of the C5-6 disc. Dr. Vogel suggested a cervical myelogram and CAT scan. She had the test done September 21, 1995. The test indicated a disc extrusion pressing on the nerve root at the C5-6 level on the left side. Dr. Vogel testified this finding coincided with her symptoms. He explained that this type of condition results in pain that fluctuates from good days to bad days.
Dr. Vogel also stated that it is not uncommon for someone to have a progressive increase in symptoms over time. There could be a tear in the disc which increases over time.
hDr. Vogel testified Mrs. Prestenback had a herniated cervical disc from the tests. She was admitted on October 30, 1995 for surgery. She had surgery and was discharged on November 1,1995.
He dictated an operative report on October 30,1995. He diagnosed her as having herniated cervical disc with cervical spondylosis. This means the disc was herniated and had begun to calcify. He testified that a jerking motion could cause a herniated disc. He removed spurs and the disc. He performed a bone fusion. Surgery was satisfactory.
Dr. Olson saw her after her surgery on November 11,1996. She had a recurrence of neck pain. This was not unusual following surgery. Dr. Olson reviewed Dr. Vogel’s x-rays and found that the fusion was working satisfactorily.
Dr. Vogel saw her in his office December 12, 1995. She had mild cervical and left shoulder pain plus numbness of both hands. He noted some persistent muscle spasm on the left. He felt she was progressing satisfactorily.
Dr. Vogel saw her again on January 16, 1996. She had moderate cervical and left arm pain, some low back and left leg pain. She called him on January 10, 1996 to tell him she went to the emergency room with a severe flare up of pain.
Dr. Vogel stated that when he saw her January 16, 1996 he noted moderate spasm in the neck and mild limitation of motion. He told her that rehabilitation would allow her to heal and he expected her to reach maximum medical improvement about a year after surgery or October 30,1996.
On January 16, 1996 he felt she would incur a 10-to-15-percent permanent partial total medical impairment of the body as a whole. Dr. Vogel testified she would be disabled from lifting, pushing, or pulling objects greater than 35 pounds or from repetitive extending or flexing of her neck.
From the records he determined that Mrs. Prestenback had muscle spasms in the neck and shoulder from August 1995 until the present time, but not before then.
Dr. Olson saw her January 31, 1996. He testified that on that date she was having a significant amount of pain. He still felt the surgery gave a fairly good result but that she had pain from a nerve root injury for three-to-four years. Therefore, the result of the surgery | gwould not be as satisfactory.
Dr. Olson stated that Mrs. Prestenback was doing well as far as neck and arm problems before the accident and that this history means that the most likely possibility was that she damaged her disc in the accident.
He stated that Dr. Smith’s MRI scan done some months after the accident showed herniated discs at C4-5 and C5-6. Dr. Olson testified that Dr. Smith chose to treat her conservatively for approximately three years but that she still had severe pain.
Appellee correctly notes that the standard of review is manifest error and “where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.” Rosell v. ESCO, 549 So.2d *155 840, 844 (La.1989). Appellee argues that Dr. Roger Smith, the neurologist who examined Mrs. Prestenbaek 10 days after the accident, did not observe any objective signs of a contusion and cervical sprain when he made that diagnosis. Dr. Smith did not find signs of muscle spasm, while he examined Mrs. Prestenbaek that date; however, he further testified that an x-ray taken that date revealed signs of muscle tightening. He explained the x-ray showed straightening of the cervical spine, which was consistent with cervical and upper thoracic sprain. Dr. Smith also testified his diagnosis was based on the history given by Mrs. Prestenbaek of having an accident on November 26, 1991. However, Dr. Smith had treated Mrs. Prestenbaek since 1986 for lower back problems and had no indication of any previous injury or symptoms from the neck area prior to this accident. There was also no evidence in the record that Mrs. Prestenbaek had pain in her neck from a cervical sprain prior to this accident.
Mrs. Prestenback’s medical records from St. Charles General Hospital were admitted into evidence. Prior to the accident, on August 16, 1991, Mrs. Prestenbaek was treated at St. Charles General Hospital for Graves Disease, a thyroid condition.
The records from St. Charles General Hospital described Mrs. Prestenbaek as having pain across her neck and difficulty swallowing. It noted she described the problem as “feels like throat is closing.” These are not the symptoms she reported following the accident.
The St. Charles General Hospital records include a radiological report by Dr. James W. Keating. The report is of an x-ray taken of her neck. It reported there was no obstruction | ¿from the thyroid disease and also reported that she had early degenerative disc disease at C5-6, but the exam was otherwise negative. The report also mentioned “some straightening of the spine suggesting muscle spasm and pain, but this may be positional [emphasis added].” While there is a suggestion of spasm on that x-ray, there was no evidence Mrs. Prestenbaek had muscle spasm in her neck at that time. Mrs. Pres-tenback was not treated by the hospital on that date for spasms in her neck, but was treated for hyperthyroidism. Dr. Smith testified that he had seen Mrs. Prestenbaek for several years and that she had thyroid problems for “some period of time.” He did not relate her thyroid condition to cervical and upper thoracic pain.
The jury’s reliance on the earlier x-ray suggesting spasm would have been reliance on speculative evidence and would constitute manifest error. In Brown v. Beauregard Elec. Co-op., Inc., 94-512 (La.App. 3rd Cir. 12/14/94) 647 So.2d 668, 672, writ denied, 95-0122 (La.3/10/95), 650 So.2d 1186 the court explained:
A plaintiff must prove by a preponderance of the evidence the existence of a causal relationship between the accident and the injuries he claims. A jury’s determination whether the plaintiff has carried this burden is a finding of fact that will not be disturbed on appeal unless it is manifestly erroneous. Housley v. Cerise, 579 So.2d 973, 978-79 (La.1991). When the factfinder resolves this issue in the face of conflicting testimony and other evidence, that conclusion will not be disturbed unless (1) the favored testimony is internally inconsistent or implausible on its face, or (2) objective evidence or reliable documents so contradict the witness’s story that it is insupportable based upon the record viewed as a whole. Stobart, 617 So.2d at 882.
Dr. Keating’s report is implausible on its face since it merely speculates neck spasm and further states the straightening of the spine may be positional.
Dr. Olson testified that the most likely possibility was that she had a damaged disc as a result of the accident. He explained that he based this on her history of having no neck and arm problems before the accident. In Orgeron v. Prescott, supra, we held at 1041:
A medical condition producing disability is presumed to have resulted from an accident if before the accident the injured person was in good health but shortly after the accident the disability-causing condition manifested itself, provided there is a *156 reasonable possibility of a causal connection between the accident and the condition. Sanders v. State Farm Mut. Automobile Ins. Co., 516 So.2d 1162, 1166 (La.App. 2nd Cir.1987); cf. American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, (La.1991).
The test for determining a causal relationship between an | ^accident and subsequent injuries is whether the plaintiff has proved through medical and lay testimony that it was “more probable than not” the injuries were caused by the accident. Mart v. Hill, 505 So.2d 1120, 1128 (La.1987).
The diagnosis and opinions of a plaintiffs treating physician and specialists to whom referred by the treating physician are entitled to more weight than that of those doctors examining the plaintiff for consultation for litigation purposes only. Schouest v. J. Ray McDermott & Co., Inc., 411 So.2d 1042, 1044 (La.1982).
It is a settled rule of law that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Perniciaro v. Brinch, 384 So.2d 392, 395 (La.1980). When the tortfeasor’s conduct aggravates a pre-existing condition, the tort-feasor must compensate the victim for the full extent of the aggravation. Lasha v. Olin Corp., 625 So.2d 1002, 1006 (La.1993).
In Orgeron we found error in the jury’s failure to award damages for the aggravation of a preexisting degenerative condition where there was no evidence the plaintiff had any problems with his knees before the accident. In that case the jury evidently gave greater weight to the testimony of the physician who only saw the plaintiff twice, rather than the plaintiffs treating physician. We found the jury was clearly wrong in doing so.
In the instant case the plaintiff was examined at defense counsel’s request by Dr. Chad Millet, an orthopedic surgeon. He testified that he saw her twice on December 29, 1994 and October 10, 1995. He examined her for'a period of three-to-four-minutes on these occasions. He diagnosed her as having chronic neck pain and did not see any objective findings of nerve root impingement. He surmised her problem to be arthritic or muscular. He found no evidence of a neurological or nerve problem. He reviewed the CT scan, myelogram and post-myelogram CT scan. The tests showed a protrusion of the disc. He described this finding as a bulging disc and differentiated it-from a herniated disc. There was impingement on the thecal sac but not on the spinal cord.
Dr. Millet stated she did not complain to him of symptoms in her hand or arm and if she had done so he would have been suspicious of a disc injury. He opined that if these symptoms developed three-and-one-half years after the accident, he'would not associate that with an injury that occurred in the accident. He would “certainly” expect arm pain and hand numbness to occur sooner. These symptoms may occur right away or appear within several | nweeks of the injury. He testified that the longest it would take would be a few months.
The evidence at trial indicates that Dr. Millet did not have complete information re-' garding Mrs. Prestenback. According to her treating physician, Dr. Smith, she did complain about numbness in her hand on December 5, 1991, ten days after the accident. Dr. Smith related that she told him if she clenched her left fist her whole hand went numb. She testified that she began having “considerable pain and numbness” in her arm and hand in 1995. She explained that she had not known there was a connection between these symptoms and her problems with her neck. Nevertheless, Dr. Millet’s assumption Mrs. Prestenback never complained of numbness in the hand until three- and-one-half years after the accident was incorrect based on the testimony of her treating physician.
Appellee also argues that the testimony and findings of all of the doctors relied principally on Mrs. Prestenback’s subjective complaints. As discussed above, objective findings were noted on testing and correlated with her symptoms.
Having found reversible error, we redetermine the facts de novo from the entire record and render a judgment on the merits. Rosell v. ESCO, 549 So.2d 840 (La.1989). We. *157 find from our review of the entire record that the plaintiffs proved Mrs. Prestenback sustained a herniated disc which was caused by the accident’s aggravating a preexisting degenerative disc disease. Dr. Smith, Mrs. Prestenback’s treating physician, testified that to a reasonable degree of medical certainty her cervical problems were caused by a combination of degenerative disc disease and the accident. He testified that to a reasonable degree of medical certainty the incident of November 26,1991 was at a minimum an aggravation of a preexisting condition based on her history. Although he diagnosed her as having a cervical sprain he testified the MRI showed disc herniation. While he found no nerve root impingement on the MRI he admitted the MRI is inadequate for excluding nerve root compression. Dr. Smith recommended that if she had no improvement that a myelogram be done. He stated that if her symptoms progressed she could require surgery. Mrs. Prestenback had a cervical myelogram in 1995, which was after her last visit with Dr. Smith. In 1995 Dr. Olson determined that an EMG showed damage at C5-C6. Dr. Vogel reviewed the myelogram and concluded she had a ruptured disc requiring surgery. Dr. Millet diagnosed her as having chronic neck pain; (i2however, he admitted that if Mrs. Presten-back had complained timely of arm and hand problems he would be suspicious of a disc injury. His conclusion she had not timely complained of problems in her arm or hand was incorrect based on the testimony of her treating physician.
DAMAGES
The only damages sought at trial were the following: (1) Mr. Prestenback’s loss of consortium, (2) Mrs. Prestenback’s medical expenses, and (3) Mrs. Prestenback’s general damages. Unrefuted evidence of the following medical expenses was introduced at trial: (1) St. Charles Hospital bill for surgery totaling $13,346.55 and (2) Dr. Kenneth E. Vogel’s bill of $6,190.00. These total $19,-536.55. Mrs. Prestenback has proven her entitlement to these medical expenses.
With regard to Mr. Prestenback’s loss of consortium claim, he testified he and his wife had been married for 30 years. He stated that since the 1991 accident his wife’s condition worsened. His relationship with his wife was strained. He could no longer hug her without hurting her. Their sexual relationship was also affected. We note that Mrs. Prestenback also had problems with her back which were unrelated to the 1991 accident. She had prior back surgery in 1985 and continued to have problems. It is clear from the medical evidence that prior medical problems also had an effect on the marriage since Mrs. Prestenback has suffered pain since her 1985 back surgery. However, Mr. Prestenback testified that since the accident her condition “worsened.” Mr. Prestenback explained that the 1991 accident had adversely affected his life. After the accident he began taking the children to school in the morning because her condition worsened. He had to take jobs which were near the house in order to assist her with household chores, and to take her for medical treatment. In light of this evidence and the physical injuries suffered by Mrs. Presten-back, we find the sum of $25,000 will adequately compensate Mr. Prestenback for his loss of consortium.
The evidence at trial establishes that Mrs. Prestenback sustained continuous and persistent chronic neck pain from the accident of November 26, 1991. Her original diagnosis was cervical sprain which had been aggravated by preexisting degenerative disc disease. She suffered pain which interfered with daily living activities. Conservative treatment over a four-| isyear period did not alleviate the problem. She experienced intractable pain in 1995 along with objective test findings of a herniated disc. She had a cervical disc fusion and was expected to reach maximum medical improvement by October 30, 1996, almost five years after the accident. She has a 10-to-15-percent permanent partial total medical impairment of the body as a whole. She will be disabled from lifting, pushing, or pulling greater than 35 pounds or from repetitive extending or flexing of her neck. We find that an award of $125,000 in general damages to be an appropriate award.
*158 Accordingly, for the reasons stated, the judgment is reversed and judgment is now rendered in favor of the plaintiffs, Mary Ann Prestenback and Norman J. Prestenback. IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Mary Ann Prestenback and against Schwegmann Giant Supermarkets, Inc. in the amount of $125,000 in general damages and $19,536.55 for medical expenses, plus interest from the date of judicial demand until paid. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Norman J. Prestenback and against Schwegmann Giant Supermarkets, Inc. in the 'amount of $25,000 plus interest from the date of judicial demand until paid. All trial costs and costs of this appeal are to be paid by defendant/appellee, Schwegmann Giant Supermarkets, Inc.
REVERSED AND RENDERED.