FREDERICKA HOMBERG WICKER, Judge.
 

 | aThe defendant/appellant, Chabanais Concrete Pumping, Inc. (“Chabanais”), appeals the trial court’s judgment casting it in judgment to the plaintiff/appellee, Mr. Lionel Powell, in the amount of $415,560.65. Based on the following, we amend the trial court’s judgment to correct a mathematical error. As amended, the judgment is affirmed.
 

 Factual and Procedural Background
 

 On August 18, 2003, Chabanais, a company in the business of providing equipment and operators to pump concrete, provided a 36-meter boom pump truck to P. Vicari Contractors for use in the construction of an addition to Archbishop Shaw High School located in Marrero, Louisiana. Mr. Richard Edwards, the operator of the truck, and his helper, Mr. Eric Dunbar, arrived at the job site around 2:00 A.M. to prepare the truck to pump concrete. Mr. Dunbar unfolded the boom and clamped a reducer to the end of the boom with a 5" clamp. He then clamped als4" hose to the other end of the reducer. The concrete was then placed into the truck and began to pump through the boom assembly.
 

 Mr. Powell, a cement finisher, was stationed on the second floor of the construction site, which is where the concrete was going to be poured. Approximately 20 other men were on site waiting for the job to begin. No one had their safety goggles on yet, because the job had not started. Mr. Powell and two other men were standing next to each other when they heard a
 
 *552
 
 loud “boom.” Immediately after hearing the “boom,” Mr. Powell’s eyes were packed with concrete. He became disoriented and fell to his knees. Mr. Powell was taken to West Jefferson Medical Center’s emergency room where his eyes were washed out. He was released later that day and was instructed to visit the Westside Eye Clinic for further evaluation.
 

 The next day, Mr. Powell visited the clinic and was initially treated by Dr. Earl Sonnier. Dr. Sonnier noted that Mr. Powell presented with chemical burns to both eyes. He prescribed Maxitrol drops, a combined antibiotic and steroid, which Mr. Powell was instructed to use four times daily in each eye. When Mr. Powell returned for a follow-up visit on August 22, 2003, he complained of blurry vision, dizziness, and light sensitivity. During that visit, his corneas were clear and his intrao-cular pressure was noted as being 16 in both eyes — which was within normal range. He was instructed to use the Maxi-trol drops three times daily. When Mr. Powell returned to the clinic on August 26, 2003, he was seen by Dr. Suzette Killeen. Dr. Killeen noted that Mr. Powell’s left eye was red and painful but that his eye pressure remained at 16. She prescribed Pred Forte drops, a steroid topical, for treatment of the left eye only. When Mr. Powell returned on August 29th, the pressure in his left eye had elevated to 25 and the right eye was 21. On September 19, 2003, the left eye pressure was 29 and the right eye pressure was |420. Then, on October 14, 2003, Mr. Powell’s right eye pressure was elevated to 25 and the left eye ranged between 35 and 38. Dr. Kil-leen suspected that Mr. Powell was suffering from glaucoma.
 

 Dr. Owen LaCour began treating Mr. Powell on March 5, 2007. When Dr. LaC-our began treating him, the pressure in his left eye was around 31. A visual field test showed a deficit in Mr. Powell’s left eye, which Dr. LaCour noted as suspicious for glaucoma — a disease that characterizes itself by the loss of peripheral vision. Because Mr. Powell’s pressure was not being controlled with drops, Dr. LaCour recommended and performed a laser surgery. After the surgery however, Mr. Powell’s pressure continued to fluctuate. Dr. LaC-our then performed a trabeculectomy (“trab”) on May 21, 2009, a surgery that created an artificial drain in order to relieve the pressure.
 

 Mr. Powell filed a Petition for Damages on August 16, 2004, against Chabanais and XYZ Insurance Company for injuries sustained during the accident. The petition alleged that Chabanais’ negligence was the proximate cause of the accident which led to his eye injury. He subsequently amended the petition on January 21, 2005, to include Sumitomo Marine & Fire Insurance Company of America as a defendant. The amended petition alleged that the Pred Forte drops caused him to contract irreversible glaucoma. Chabanais subsequently moved for a partial summary judgment on September 10, 2009. In the motion, Chabanais argued that it should receive a credit for all past and future medical expenses paid by the Eye, Ear, Nose, and Throat Foundation (EENT). Its argument was premised on the fact that the expenses were not a collateral source because Mr. Powell did not contribute to the plan that paid the expenses. The motion was denied, and the trial commenced on June 14, 2010.
 

 |fiMr. Richard Edwards, the operator of the pump truck, was deposed for trial. He testified that he performed a visual inspection of the equipment before the concrete was pumped but did not perform any type of test to determine the pump’s structural soundness. Mr. Edwards explained that the visual inspection involved lifting the
 
 *553
 
 reducer to determine whether it was too light. Once the truck passed the visual inspection, he stated that his helper, Mr. Dunbar, prepared the truck for the concrete. He testified that once the concrete began to flow, the reducer blew out in the middle. He stated that the reducer and hose were assembled correctly because if not, the concrete would have burst the pipes at the clamp instead of the middle of the reducer. He noted that he reported the accident to his employer when the job was finished.
 

 Mr. Edwards, who had been a concrete pump operator for 13 years, testified that in his opinion, there were two possible causes of the failed reducer. He first noted that the concrete could have been too thin, explaining that thin concrete causes rocks to build up and clog the pipes. Secondly, he noted that a reducer is a wear item which could fail due to wear if not regularly replaced.
 

 Mr. Charles Chabanais, a manager at Chabanais, testified that it was company policy to perform a complete inspection of the trucks every 600 engine hours but that the reducers were to be inspected daily. He testified that the method Chabanais used to inspect the reducer involved lifting it to determine whether it was too light. He explained that Mr. Huey Marcelle, the supervisor for inspections, performed a complete inspection of the truck on July 1, 2008. He further testified that Chabanais had no written policy which instructed employees what to do in case of an accident and that there was no written policy on how to investigate an accident. He noted that Chabanais did not have accident reports, safety committees, safety reports or safety manuals. He also testified that at the 1 fitime of the accident, the company had seven to eight trucks, yet he had no system in place to determine which trucks had the oldest or newest reducers.
 

 Mr. Chabanais further stated that the first time he was asked to produce the reducer was November 21, 2006, but at that time, it had already been discarded. He noted that the reducer was not tested before it was discarded but added that he had never had a reducer to fail prior to this particular accident.
 

 Mr. Giddings Emery testified at the trial as an expert in the field of mechanical engineering and construction. Mr. Emery testified that two methods exist to determine a reducer’s safety. One method is by a visual inspection which involves checking for dents, bends, and cracks. The other method is to perform a wall thickness reading with a caliper, a $5 instrument similar to a ruler. To the best of his knowledge, Chabanais did not perform a wall thickness test on the reducer. He opined that Chabanais’ policy of inspecting the trucks every 600 engine hours was not in line with the industry standard. He based that opinion on the 2006 safety manual from the Concrete Pump Manufacturer’s Association (“CPMA”) which stated that inspections should be performed monthly or less.
 
 [1]
 
 Mr. Emery further noted that a reducer is a wear item that must be periodically replaced. He opined that in this case, the problem which caused the defect could be attributed 99 percent to wear of the reducer.
 

 Mr. Jeremy Hoffpauir also testified as an expert in mechanical engineering. He first stated that without the physical evidence of the reducer, there was no way to determine, within any degree of scientific certainty, why the reducer failed. He
 
 *554
 
 stated, however, that numerous causes exist for the failure of a reducer, i.e., a manufacturing defect, a material defect, a prior defect, or wear. He opined that 17Chabanais’ policy of performing a complete inspection every 600 engine hours was consistent with the American Concrete Pumping Association (“ACPA”) and Conforms
 
 [2]
 
 policies because neither of them provided a set protocol for inspection. He testified that he telephoned the ACPA and was informed that there was no requirement that the reducer be inspected and that the only requirement for inspection related to the boom itself. He further testified that Conforms told him the same thing. Thus, in his opinion, inspecting the truck every 600 engine hours met standard practices. He noted, however, that the reducer is a wear item and that if never replaced, there was a 100 percent chance for failure.
 

 Dr. Jonathan Nussdorf, who qualified as an expert in ophthalmology specializing in glaucoma, was deposed for trial. Dr. Nussdorf stated that he examined Mr. Powell on March 19, 2008, and that his examination did not reveal any evidence of old trauma. He noted, however, that Mr. Powell’s left eye pressure was 28/29, which he considered elevated and ocular hypertensive. He added that elevated eye pressure, however, was not indicative of glaucoma because glaucoma was simply the loss of peripheral vision. Dr. Nussdorf classified Mr. Powell as a steroid responder, explaining that he had underlying glaucoma prior to using the Pred Forte drops. He further stated that there was a less than three percent chance that the drops caused Mr. Powell’s glaucoma.
 

 Dr. Suzette Killeen, one of Mr. Powell’s treating ophthalmologist, was also deposed for trial. Dr. Killeen opined that Mr. Powell likely experienced significant pain for the first 24 to 48 hours after the accident. She noted that the cornea, which has the greatest concentration of nerve endings in the smallest space, is extremely sensitive. She testified that the pain Mr. Powell experienced by having concrete jammed into his eyes was probably worse than a broken bone. She further noted Rthat Mr. Powell’s pressure was normal before she prescribed the Pred Forte drops but began to elevate thereafter. She opined that Mr. Powell’s glaucoma resulted from the steroid he was given to treat the condition that occurred secondary to his trauma.
 

 Dr. Owen LaCour, another one of Mr. Powell’s treating ophthalmologists, testified that he began treating Mr. Powell on March 5, 2007. Dr. LaCour testified that although Mr. Powell’s left eye pressure was 81 during the initial visit, the actual pressure was higher because he presented with thin corneas, explaining that thin corneas falsely lower the eye pressure. Dr. LaCour stated that the three drops Mr. Powell was using should have decreased the pressure.
 
 [3]
 
 He recommended and performed laser surgery, however, because Mr. Powell’s pressure remained elevated with the use of the drops. Dr. LaCour continued to monitor Mr. Powell after the laser surgery, but the pressure continued to fluctuate. He then decided to surgically intervene. Dr. LaCour performed the trab on May 21, 2009, noting that its average life span is two to five years. He further stated that, after the surgery, it was more probable than not that Mr. Powell’s condition could be controlled with Xa-latan, Erythromycin, and Omnipred for the next two to five years. After that time
 
 *555
 
 frame, however, Mr. Powell would require more surgery.
 

 Specifically, Dr. LaCour testified that Mr. Powell would likely require another trab during his lifetime, explaining that three trabs was the maximum a person could safely have. He further testified that after either the second or third trab, he would likely have to perform another surgery called a valve procedure. He stated that the valve procedure also had a lifespan of two to five years. Finally, Dr. LaCour added that Mr. Powell would eventually develop a cataract in his left eye because of the steroid and would require cataract surgery as well.
 

 |9Pr. LaCour testified that he could not rule out the possibility that the lumbar facet steroid injections
 
 [4]
 
 Mr. Powell received in September 2003 and January 2004 contributed to intraocular hypertension and glaucoma. It was his opinion, however, that, within a reasonable degree of medical certainty, the trauma Mr. Powell sustained, coupled with the steroid drops, made his left eye more susceptible to glaucoma. He noted, however, that Mr. Powell’s glaucoma had not affected him functionally in that Mr. Powell could not tell that his peripheral vision had been diminished. Dr. LaCour stated that glaucoma was not a painful disease and that it did not require the use of pain medication. He also stated that blindness was a potential risk associated with glaucoma but that he did not believe Mr. Powell would go blind in this case.
 

 Dr. LaCour noted that Mr. Powell’s past medical expenses incurred at his office totaled $6,915.00. He further stated that Mr. Powell would likely incur a yearly expense, without surgery, of $780.00 for the next 26 years, until he attained the age of 70. He projected surgical costs, which included additional trabs; a valve procedure, and cataract surgery, as $15,000.00. Finally, he projected glaucoma medication costs as $64,000.00. In all, Dr. LaCour projected total future medicals of $106,195.00.
 

 Mr. Powell testified that, as a cement finisher, it was routine to get sand and dust into his eyes. In fact, he testified that in July of 2000, he visited an ophthalmology clinic to have his eyes washed out for that reason. He further testified that in 1999, he sustained an injury above his left eyebrow. At that time, he was observed by a doctor and his eye pressure was 14 in both eyes. Mr. Powell noted that prior to the accident, he never had an abnormal eye exam.
 

 | ipMr. Powell stated that the force of the concrete hitting his eyes was so impactful that he fell to his knees. He became disoriented, could not open his eyes and was scared that he would never see again. He stated that the intense and substantial pain lasted for two days. He testified that he had experienced several painful events during his lifetime. He had broken an ankle, had a burst appendix, and suffered a back injury. He noted that on a scale from one to ten, with ten being the worst pain, the pain from the broken ankle and back injury was a five and that the burst appendix was a nine. He stated, however, that having the cement thrust into his eyes was a ten.
 

 Mr. Powell stated that he currently takes Xalatan for his right eye and Eryth-romycin and an Omnipred ointment for his left eye, adding that he will have to use eye drops for the remainder of his life. He testified that he takes those three
 
 *556
 
 drops twice daily, causing him a daily inconvenience of about 30 minutes. Mr. Powell stated that he is constantly fearful of permanently losing his sight. He testified, however, that he has not taken any pain medication since the accident and that the accident has not affected his daily activities. In fact, since the accident occurred, Mr. Powell noted that he has been on about 15 concrete jobs.
 

 In regards to his financial status, Mr. Powell testified that he is indigent and has no insurance. He testified that the EENT, a non-profit entity which assists indigent patients, pays all of the medical bills he incurs at Dr. LaCour’s office less a $20 office copay which he is responsible for. He testified that he also pays $20 each month at the drug store for the Er-ythromycin and Omnipred, noting that he currently receives Xalatan for free through a program sponsored by Pfizer. He added that he will likely require more surgeries in the future.
 

 The trial court took the matter under advisement and rendered its judgment on September 28, 2010, in favor of Mr. Powell in the amount of $415,560.65. The lnaward included $300,000 in general damages, $106,195.00 for future medicals, and $9,365.65 for past medical expenses. Cha-banais moved for a new trial on October 5, 2010. The motion was denied on January 4, 2011. This appeal follows.
 

 Assignments of Error
 

 Chabanais presents the following assignments of error for review:
 

 1. Whether the defendants were liable for plaintiffs accident given that the reducer was not defective and/or the defendants lacked prior notice of any defective condition prior to the accident;
 

 2. Whether the plaintiff should have been assigned fault for the accident and if so, the degree of fault;
 

 3. Whether the plaintiffs glaucoma was caused by the subject accident or from medication prescribed for the eye injury from the accident;
 

 4. Whether the general damages award was excessive; and
 

 5. Whether the defendants were entitled an offset and/or credit for the plaintiffs future medical bills that would be paid by a charity to which the plaintiff did not contribute any funds.
 

 Discussion
 

 First Assignment of Error
 

 In its first assignment of error, Chaba-nais argues that under theories of negligence and strict liability, it is not liable because Mr. Powell failed to prove that the reducer was defective.
 

 In an action to recover damages for injuries allegedly caused by another’s negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence.
 
 Hanks v. Entergy Corp.,
 
 06-0477 (La.12/18/06), 944 So.2d 564, 578;
 
 Benjamin ex rel. Benjamin v. Housing Authority of New Orleans,
 
 04-1058, p. 5 (La.12/1/04), 893 So.2d 1, 4;
 
 Cangelosi v. Our Lady of the Lake Regional Medical Center,
 
 564 So.2d 654, 664 (La.1989). “Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not.”
 
 Id.
 
 Thus, the plaintiff must produce evidence from which the factfin-der can reasonably conclude his injuries, more probably than not, were caused by the defendant’s negligence.
 
 Id.
 
 The plaintiff, however, does not have to conclusively exclude all other possible explanations for his injuries.
 
 Id.
 

 
 *557
 
 In this case, Mr. Edwards testified that failure of the reducer caused the accident. While the experts testified that there were various reasons why a reducer might fail, there was no evidence to indicate that the reducer involved in the accident was new nor was there evidence that Chabanais’ reducers were periodically replaced on a predetermined schedule. The testimony does reveal, however, that reducers are 100 percent wear items. On the morning of the accident, Mr. Edwards only lifted the reducer to determine its weight. He did not inspect it for cracks, dents, or bends. Because Chabanais discarded the reducer, the cause of its failure cannot be determined.
 
 [5]
 
 As such, Chaba-nais argues that Mr. Powell did not prove causation because he did not prove that the reducer failed. Chabanais cites to La. C.C. art. 2317.1 to support its position. However, an important caveat of La. C.C. art. 2317.1 provides, “[n]othing in this Article shall preclude the court from the application of the doctrine of res
 
 ipsa loquitur
 
 in an appropriate case.”
 

 In
 
 Ullrich v. Jefferson Parish Hospital Service District No. 2,
 
 03-0958, p. 8 (La.App. 5 Cir. 1/27/04), 867 So.2d 7, 12, this Court explained that the doctrine of 11sres
 
 ipsa loquitur
 
 applies when: “(1) the accident would not normally occur in the absence of negligence, (2) there is an absence of direct evidence to explain the activities leading to the injury, and (3) the accident or injury was caused by an agency on instrumentality within the actual or constructive control of the defendant.” Thus, the plaintiff must show that the injury would not normally occur in the absence of negligence.
 
 Id.
 
 As long as the fact-finder can “reasonably conclude that plaintiffs injuries were, more probably than not, caused by defendant’s negligence under the particular facts of a case, the doctrine of
 
 res ipsa loquitur
 
 applies.”
 
 Id.
 
 (citations omitted).
 

 We find that the present case is ripe for the application of
 
 res ipsa loqui-tur.
 
 We first note that under the circumstances of this case, the accident is not one that would have normally occurred in the absence of negligence. It is undisputed that the cement which spewed from the boom assembly injured Mr. Powell. Next, we note that there is an absence of direct evidence to explain what caused the accident. Finally, we note that the accident was caused by equipment and employees within Chabanais’ control.
 

 In addition to the causation elements, however, a plaintiff asserting a cause of action in either negligence or strict liability must also prove the following: “(1) that the defendant knew or should have known of the vice or defect, (2) that the damage could have been prevented by the exercise of reasonable care, and (3) that the defendant failed to exercise such reasonable care.”
 
 Zapalowski v. Campbell,
 
 08-0055, p. 7 (La.App. 5 Cir. 6/19/08), 988 So.2d 772, 777,
 
 writ denied,
 
 08-1642 (La.10/24/08), 992 So.2d 1036.
 

 In this case, the evidence supports the conclusion that Chabanais’ failure to exercise reasonable care resulted in the accident that caused Mr. Powell’s injury. We
 
 *558
 
 note that the inspection report indicates that the truck involved in the accident 114was inspected on July 1, 2003. The report, however, fails to specifically mention anything about the reducer. Moreover, Chabanais did not maintain any type of record specifying which reducers were on which trucks nor did its records specify the age of the reducers on the trucks. Mr. Chabanais stated that he inspected the reducers by merely lifting them to determine whether they were too light. Mr. Emery confirmed that a visual inspection was acceptable but added that it should involve checking the reducer for dents, bends, or cracks. There is no evidence that such an inspection occurred in this case. Moreover, Mr. Edwards’ visual inspection on the morning of the accident did not include any test to determine the pump’s structural soundness. We further note that although the two mechanical engineering experts disagreed on the proper procedure for inspecting the reducers, both agreed that the reducer was a wear item that would fail if not replaced.
 

 Based on the totality of the evidence, we find that the trial court did not err in finding that Chabanais’ negligence caused the accident in this case. We further find that Chabanais should have known, through the exercise of reasonable care, that its equipment was defective. Therefore, this assignment of error is without merit.
 

 Third, Assignment of Error
 

 In its third assignment of error, Chabanais contends that the trial court erred when it determined that Mr. Powell's glaucoma was caused either by the accident or by the Pred Forte drops prescribed to treat the eye injury.
 

 In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the accident and the complained-of injuries.
 
 Spillers v. ABH Trucking Co., Inc.,
 
 30,332 (La.App. 2 Cir. 4/13/98), 713 So.2d 505, 509,
 
 writ denied,
 
 98-1313 (La.6/26/98), 719 So.2d 1063;
 
 American Motorist Insurance Co. v. American Rent-All, Inc.,
 
 579 So.2d 429 (La.1991). The test for determining the 11Bcausal relationship between the accident and subsequent injuries is “whether the plaintiff proved, through medical testimony, that it was more probable than not that the subsequent injuries were caused by the trauma suffered in the accident.”
 
 Id.
 
 (citations omitted). Plaintiffs are aided in proving the causal relationship between the accident and their injuries by the legal presumption that “a medical condition producing disability is presumed to have resulted from the accident if the injured person was in good health prior to the accident, but shortly after the accident, the disabling condition manifested itself.”
 
 Id.
 
 To overcome this presumption, the defendant must show that some other particular incident could have caused the injury in question.
 
 Id.
 

 Mr. Powell stated that he had never had an abnormal eye exam before the accident occurred. That testimony was not contradicted. The expert witnesses, Drs. Kil-leen, LaCour, and Nussdorf, all confirmed that Mr. Powell’s previous medical records reflected that his eye pressure was within normal range in 1999. The three experts, however, differed in their opinion on whether the August 18, 2003, accident caused Mr. Powell’s glaucoma.
 

 Drs. Killeen and LaCour found that Mr. Powell’s glaucoma resulted from the steroid drops he used to treat the elevated eye pressure caused by the accident. Dr. Kil-leen noted that the lumbar facet steroid injections Mr. Powell received could have elevated his eye pressure. She pointed out, however, that the pressure was more elevated in the left eye, which was the only eye he used the Pred Fort drops in.
 
 *559
 
 Because of this, she opined that Mr. Powell’s glaucoma was “the result of the steroid he was given to treat the condition that occurred secondary to his trauma.” Dr. LaCour also could not rule out the possibility that the lumbar facet steroid injections contributed to Mr. Powell’s glaucoma. However, he opined, within a reasonable degree of medical certainty, that the trauma Mr. Powell | ^sustained, coupled with the steroid drops, made his left eye more susceptible to glaucoma. Dr. Nussdorf testified that Mr. Powell likely had underlying glaucoma that was exacerbated by the steroid use. He opined that there was a less than three percent chance that the Pred Forte drops caused Mr. Powell’s glaucoma.
 

 Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible.
 
 Mistich v. Volkswagen of Germany, Inc.,
 
 95-0939 (La.1/29/96), 666 So.2d 1073. Moreover, “the diagnosis and opinions of a plaintiffs treating physician and specialists to whom referred by the treating physician are entitled to more weight than that of those doctors examining the plaintiff for consultation for litigation purposes only.”
 
 Prestenback v. Schwegmann Giant Supermarkets, Inc.,
 
 96-0793 (La.App. 5 Cir. 1/28/97), 688 So.2d 149, 156,
 
 writ denied,
 
 97-0977 (La.5/30/97), 694 So.2d 249;
 
 Schouest v. J. Ray McDermott & Co., Inc.,
 
 411 So.2d 1042, 1044 (La.1982). Because Drs. Killeen and LaCour were Mr. Powell’s treating physicians, we cannot say that the trial court was manifestly erroneous in giving their testimony more weight than that of Dr. Nussdorfs. Therefore, this assignment of error is without merit.
 

 Fourth Assignment of Error
 

 In its fourth assignment of error, Chabanais argues that in light of Mr. Powell’s positive diagnosis, the $300,000 award in general damages is excessive. To support its contention, he points to other eye injury cases in which the general damages awards ranged between $25,000 and $40,000.
 
 See Aguillard v. Langlois,
 
 471 So.2d 1011 (La.App. 1 Cir.1985);
 
 Schexnaider v. State Farm Ins.,
 
 541 So.2d 223 (La.App. 4 Cir.1989);
 
 Cole v. City of West Lake,
 
 517 So.2d 928 (La.App. 3 Cir.1987).
 

 117The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.
 
 Youn v. Mar. Overseas Corp.,
 
 623 So.2d 1257, 1260 (La.1993). The Louisiana Supreme Court has established two standards in the appellate review of lower court awards:
 

 (1) To modify the amount of the award an appellate court must find that the trial judge or jury abused the
 
 much discretion
 
 accorded by the codal provisions in making the award, and (2) The award in other cases serve only as an aid in determining whether there has been an abuse of the discretion.
 
 Coco v. Winston Industries, Inc.,
 
 341 So.2d 332 (La.1977);
 
 Reck v. Stevens,
 
 373 So.2d 498 (La.1979).
 

 Martin v. Gulf S. Beverages, Inc.,
 
 454 So.2d 250, 254-55 (La.App. 5 Cir.1984).
 

 In this case, we cannot say the trial judge abused its discretion. The record reflects that Mr. Powell had cement thrust into his eyes with such force that he fell to his knees. He became disoriented and was afraid that he would never see again. He was immediately rushed to the emergency room where it was noted that he was unable to open his eyes. The intense pain that Mr. Powell experienced on the morning of the accident lasted for forty-eight hours. Since the accident, Mr. Powell has had undergone two surgical proce
 
 *560
 
 dures and has made numerous visits to the doctor’s office. He will continue to have a lifetime of doctor’s care and medication in that he will require daily administration of eye drops, monthly visits to the pharmacy, yearly eye exams, and a minimum of three additional surgeries through the remainder of his lifetime. This, coupled with the fact that he is constantly fearful of permanently losing his sight.
 

 In addition, Dr. LaCour projected that Mr. Powell would likely incur a yearly medical expense, without surgery, of $780.00 for the next 26 years, until he attained the age of 70. He also projected surgical costs of $15,000.00 and glaucoma medication costs of $64,000.00.
 

 |isln
 
 Rayborn v. Diamond Offshore Co.,
 
 02-0084, p. 9 (La.App. 4 Cir. 11/13/02), 882 So.2d 1052, 1057-8, the Fourth Circuit determined that the plaintiff, who sustained an eye injury, was entitled to $300,000 in general damages. That court noted that $250,000
 
 [6]
 
 was the highest amount the jury could have reasonably awarded for the initial injury. In support of its finding, the Fourth Circuit determined that the plaintiff experienced extreme stress and feared the possibility of blindness.
 
 Id. See Martin, supra
 
 (where this Court affirmed a $300,000 general damages award to a plaintiff who sustained an eye injury.). Accordingly, we will not disturb the trial court’s award.
 

 Second Assignment of Error
 

 In its second assignment of error, Chabanais contends that the trial court erred when it failed to assign fault to Mr. Powell for the accident. The crux of Cha-banais’ argument is that Mr. Powell, an experienced cement finisher, contributed to his own injury because he was not wearing safety goggles when the accident occurred. The record reflects, however, that the accident occurred before the job began. Chabanais offered no evidence or testimony to rebut this fact. Therefore, it was unnecessary for Mr. Powell to be wearing goggles at the moment the accident occurred. Therefore, this assignment of error is without merit.
 

 Fifth Assignment of Error
 

 In its fifth assignment of error, Chabanais argues that because the EENT is not a collateral source, it is entitled to a credit for the future medical bills the EENT will pay on Mr. Powell’s behalf.
 

 Under the collateral source rule, “a tortfeasor may not benefit, and an injured plaintiffs tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor’s procuration or contribution.”
 
 Bozeman v. State,
 
 03-1016, p. 9 (La.7/2/04), 879 So.2d 692, 698. Hence, payments received from an independent source are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer, and, “a tortfea-sor’s liability to an injured plaintiff should be the same, regardless of whether or not the plaintiff had the foresight to obtain insurance.”
 
 Id.
 

 Chabanais relies on
 
 Bozeman, supra,
 
 to support its position that it should be given a credit for the amounts that will be paid by the EENT. Chabanais states in its brief, “[m]edicaid recipients are unable to collect the Medicaid
 
 “write-off
 

 [7]
 

 ” amounts
 
 
 *561
 

 as damages
 
 because no consideration is provided for the benefit,”
 
 citing, Bozeman, supra,
 
 at 705 (emphasis added). In
 
 Boze-man,
 
 the plaintiff sought to recover amounts in excess of what Medicaid actually paid for medical services. Although the court, in
 
 Bozeman,
 
 determined that the plaintiff was not entitled to those amounts, it did determine that the plaintiff was entitled to the amounts Medicaid had actually paid. Thus, Chabanais’ reliance on this case is misguided.
 

 In this case, Mr. Powell only seeks to recover the amounts that the EENT will actually pay for his medical services. Cha-banais maintains, however, that the EENT is not a collateral source because Mr. Powell has not suffered a diminution of his patrimony in order to receive the benefit. Although Mr. Powell does not pay a premium,
 
 per se, for
 
 medical benefits from the EENT, he is required to pay a $20 copay. Thus, the $20, which would have been available to him but for the injury, is no longer available and he has therefore sustained a loss. But even if the medical services cost Mr. Powell nothing, Chabanais cannot profit thereby.
 
 See Spizer v. Dixie Brewing,
 
 210 So.2d 528, 533 (La.App. 4 Cir.1968). Therefore, this assignment of error is without merit.
 

 12pAs a final matter, the trial court committed a mathematical error in its judgment. In discharging our duty of rendering a judgment that is just, legal, and proper upon the record on appeal, we must correct that error. La. C.C.P. art. 2164;
 
 Woods v. Ratliff,
 
 407 So.2d 1375 (La.App. 3 Cir.1981). The judgment in this case awards:
 

 General Damages: Physical pain and suffering and emotional distress $300,000.00
 

 Future medicals, inclusive of projected glaucoma medications, projected surgical costs and office visits and testings $106,195.00
 

 Past Medical Expenses
 

 West Jefferson Medical Center o O i — i CO rH
 
 I*z-'
 
 Ufir
 

 Jefferson Radiology O O oo ⅛/J
 

 West Bank Eye Clinic O O tr-o> XT»
 

 Walgreens LO CD oo
 

 Dr. Jay LaCour o p P CD
 

 Dr. Warren Whitcomb o O cd i-l |»/-⅝
 
 \JV
 

 The trial court erroneously included Dr. LaCour’s past medical expense of $6,915 into the future medicals award. During the trial, the following exchange occurred between Chabanais’ counsel and Dr. LaC-our:
 

 Q. Okay. So the total past offices [sic] visits are 3,915. The past surgical expense is 3,000 correct?
 

 A. Uh-huh.
 

 Q. Is that a yes?
 

 A. Yes, that is. Sorry
 

 [[Image here]]
 

 Q. Right. So your future medical care that you provided out on this Plaintiffs Exhibit Number 11—
 

 A. Uh-huh.
 

 Q. —includes the past medical expenses that have been incurred since you generated this document.
 

 121 A. Correct.
 

 [[Image here]]
 

 
 *562
 
 Q. [By Mr. Powell’s counsel] All right. And then if you backed out 6,955 [sic] from the 106,000 and change that you put down there, its approximately 100 grand is what you came up with, right— A. That is correct.
 

 Q. —for future medicals. Is that right?
 

 A. That’s correct.
 

 The testimony, which is supported by documentary evidence, reflects that the future medicals award should be reduced by $6,915.00.
 

 Conclusion
 

 Based on the foregoing, the trial court’s judgment is amended to reduce future medicals by $6,915.00. As amended, the judgment is affirmed.
 

 AFFIRMED, AS AMENDED
 

 [1]
 

 . Mr. Emery testified that it was error for him to rely on the 2006 CPMA safety manual which became effective on December 2, 2006. He noted that he should have relied on the safety manual that was in effect when the accident occurred in 2003.
 

 [2]
 

 . Conforms was the manufacturer of the reducer.
 

 [3]
 

 . When Mr. Powell began treatment with Dr. LaCour, he was using Cosopt, Alphagan P and Xalatan.
 

 [4]
 

 . Mr. Powell sustained an unrelated back injury after the accident. Steroid injections were part of his treatment.
 

 [5]
 

 . A presumption may arise in the theory of spoliation of evidence when it is an intentional destruction of evidence for the purpose of depriving the opposing parties of its use.
 
 Lewis v. Albertson’s Inc.,
 
 41,234 (La.App. 2 Cir. 6/28/06), 935 So.2d 771, 774. Although Mr. Powell states in his brief that the trial court would have been justified in finding that Chabanais spoliated evidence, there is no allegation of spoliation in the record. Moreover, the record does not support a finding that Chabanais intentionally destroyed the reducer to deprive his opponent of its use. Therefore, we decline to apply the presumption of spoliation of evidence in this case.
 

 [6]
 

 . The additional $50,000 was awarded for the plaintiff's conversion disorder.
 

 [7]
 

 .
 
 Bozeman, supra,
 
 at 693 ("When an injured plaintiff is a Medicaid recipient, federal and state law require that the healthcare providers accept as full payment, an amount set by the Medicaid fee schedule, which, invariably, is lower than the amount charged by the healthcare provider. The difference between what is charged by the healthcare providers
 
 *561
 
 and what is paid by Medicaid is referred to as the "write-off” amount.”)